Catherine **WAGNER**, Anne Marie Sorcinelli, and Jenny Harrison, Plaintiffs–Appellants,

v.

The **NUTRASWEET COMPANY**, Defendant–Appellee.

No. 95–3315.

United States Court of Appeals, Seventh Circuit.

Argued April 3, 1996.

Decided Sept. 5, 1996.

Thomas R. Meites (argued), Joan H. Burger, Paul W. Mollica, Laurie A. Wardell, Meites, Frackman, Mulder & Burger, Chicago, IL, for plaintiffs-appellants.

Richard C. Robin, Edward C. Jepson, Jr. (argued), Thomas G. Abram, Carlys E. Belmont, Karen T. Donmoyer, Vedder, Price, Kaufman & Kammholz, Chicago, IL, for defendant-appellee.

Before BAUER, EASTERBROOK, and DIANE P. WOOD, Circuit Judges.

DIANE P. WOOD, Circuit Judge.

As the parties delicately put it in this case, the NutraSweet Company realized that some changes in its business strategy were going to be necessary when "certain of its patents" expired in December 1992. (We assume that they meant the blockbuster patents related to the chemical substance aspartame, an artificial sweetener that, at the time, accounted for approximately $1 billion in annual sales. See Alix M. Freedman, *Monsanto Touts New Sugar Substitute as Sweetest Yet*, WALL STREET JOURNAL, March 29, 1991.). When managerial employees Catherine Wagner, Anne Marie Sorcinelli, and Jenny Harrison lost their jobs as a result of the "reconfiguration" that took place, they sued under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and the Equal Pay Act, 29 U.S.C. § 206(d), both individually and on behalf of a class. In two separate orders, the district court granted summary judgment for

NutraSweet on all claims. Although we agree with most of its conclusions, we find that some of the claims should have withstood summary judgment. We therefore affirm in part and reverse and remand in part.

## I

NutraSweet was originally a subsidiary of G.D. Searle & Co., the multinational pharmaceutical company. In 1985, Monsanto Co. (of St. Louis, Missouri) bought Searle and its NutraSweet food products division. In 1986, NutraSweet was spun off and made an independent unit of Mansanto Co. Within the NutraSweet unit, there were a variety of salary classifications and compensation systems, the details of which we need not explore for present purposes. In March 1989, the firm of James H. Lowry & Associates issued a report, commissioned by NutraSweet for its internal use, that revealed major disparities in income between male and female management personnel, in favor of the male employees. As far as the record shows, NutraSweet took no particular steps to improve this situation.

In late December 1990, as noted, NutraSweet decided that it needed to implement a significant reduction in force, due to the impending patent expirations. It developed a set of Separation Guidelines in conformity with the Employee Retirement Income Security Act (ERISA), which it published to its employees effective March 1, 1991. The Guidelines described the benefits available to "certain eligible employees" whose termination of employment was due to reasons other than retirement, transfer to an affiliated employer, or other circumstances that did not result in a period of unemployment. Part III of the Guidelines stated that "[a]n employee may be granted severance benefits" of the described type depending upon the reason for termination, employment status, length of service, and base salary. Both a wage benefit and a welfare benefit (covering medical, dental, and vision) would be available for specified lengths of time. The wage benefit referred to a possibility of "redeployment," in which case the benefit would be adjusted prior to the first day of "redeployment." In the General Provisions, the Guidelines state that "[s]eparation benefits provided hereunder are a gratuity and no employee is entitled to benefits hereunder prior to termination of employment." The company reserved the right to terminate the program at any time, in its sole discretion.

With the Guidelines in place, NutraSweet began implementing its reduction in force. On or around March 25, 1991, it began sending letters to the unlucky people who were to lose their jobs. The letters described the benefits available under the Guidelines and added that the company would assist with outplacement services (a benefit not mentioned in the Guidelines). Each letter also contained a general release, which stated:

> In consideration of the payments set out in this letter, you for yourself, your executors, personal representatives, successors and assigns hereby release and absolve the officers, directors, successors and assigns from any and all claims, charges, demands, or causes of action, known or unknown, asserted or unasserted, in any way arising from your employment, separation of employment or failure to be recalled or rehired by the company, including but not limited to, all claims which have been raised pursuant to any common law cause of action or pursuant to any federal, state or local statute, order, law or regulation. In making this Agreement, you and the Company agree that you were an "employee at will" of the Company and not employed pursuant to either a written or oral employment contract.

Directly below the release language was a line for the employee's signature. Each of the appellants before us signed the release, and each has a different story.

Wagner was the Director of Human Resources for NutraSweet's Research and Development (R & D) Group. In early 1991, she was responsible for implementing various components of the reconfiguration plan as they related to the termination of R & D employees. The number of terminations in the R & D Group was great enough to trigger the provisions of the Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101 *et seq.* (WARN Act). In light of the significant reduction in the R & D staff,

Wagner concluded that NutraSweet no longer needed a director responsible for R & D human resources. She recommended that her position should be eliminated and a manager position created in its place. Wagner's boss agreed, and he offered the new manager position to Wagner, but she declined it, believing that this would represent a step back in her career path. On March 25, 1991, along with the rest of the employees, NutraSweet offered Wagner a "separation package," which included the general release set forth above. Specifically, it offered Wagner two months' redeployment pay beginning August 5, 1991, outplacement services, and severance benefits worth more than $46,000. NutraSweet also offered Wagner a "Retention Period" so that she could complete various projects with retention pay equal to one-half the amount of her separation pay. She signed the March 25, 1991, release, and agreed to continue working for NutraSweet during the Retention Period. On August 1, 1991, as that period was drawing to a close, NutraSweet presented Wagner with another "separation letter" that asked her to release the company from liability for all claims accruing during the period from March 30, 1991, through August 5, 1991. Wagner refused to sign this agreement because she believed that NutraSweet had discriminated against her during the Retention Period.

Sorcinelli was the Director of Human Resources for the NutraSweet Business Group. The 1991 reconfiguration resulted in a substantial reduction in the Business Group's staff and a corresponding reduction in the scope and content of Sorcinelli's job. Consequently, Sorcinelli felt that staying with NutraSweet would be a step down for her. She notified NutraSweet of her intention to resign and asked for and was given a separation package. At that time, Sorcinelli believed that she had been discriminated against while employed by the company because she did not receive the same compensation as the male employees at her level in her group. On more than one occasion, she complained to her supervisor and others about the amount of her bonus compared to that of the others. Like Wagner's, Sorcinelli's separation package provided her the opportunity to receive redeployment pay and

outplacement services if she signed the release. She did not, however, have any opportunity to stay on during a Retention Period. Sorcinelli signed, and she received redeployment pay for the period April 30, 1991, through July 1, 1991, a 40–week severance package, and a $10,000 relocation payment.

Harrison worked in the Business Ventures Group, where she was involved in the negotiation and interpretation of NutraSweet's agreements with outside consultants. She, too, learned in March 1991 that her job had been eliminated. Soon after, she attended a meeting at which two human resources employees presented her with a separation package. She waited two days, apparently not consulting an attorney, and then signed the release and agreed to the package. Similarly to Sorcinelli, she received outplacement services, two months' redeployment pay (through June 3, 1991), and severance pay (from June through October 13, 1991). Also like Sorcinelli, Harrison believed that from as early as 1988 similarly situated men were receiving higher salaries and bonuses than she.

## II

In the district court, Wagner, Sorcinelli, Harrison, and a fourth plaintiff not before us on this appeal, Sarah Baldwin Weissman, claimed that NutraSweet had discriminated against them on the basis of sex in violation of Title VII and the Equal Pay Act. It was undisputed that all plaintiffs had satisfied the necessary procedural prerequisites for their suits. They attempted to sue on behalf of themselves and a class of other female managerial employees who were similarly situated. NutraSweet argued that the releases barred their suit; the plaintiffs responded that Harrison had not "knowingly and voluntarily" signed her release, that Wagner's and Harrison's releases were not supported by consideration, and that even if the releases were valid, Wagner and Sorcinelli had post-release claims that were not affected by the releases.

In an order of October 17, 1994, the district court granted summary judgment for NutraSweet with respect to all claims brought by Harrison, Weissman, and Sorci-

nelli, and summary judgment on Wagner's claims that arose before March 25, 1991, the date of her release. It denied summary judgment on Wagner's post-release claims. Finally, it denied the plaintiffs' motion for class certification as moot. See *Wagner v. Nutrasweet Co.*, 873 F.Supp. 87 (N.D.Ill. 1994). With respect to Harrison (and Weissman), the court concluded that the releases were valid and supported by adequate consideration, since NutraSweet was not required to provide redeployment pay to them. Because they had not tendered this consideration back to NutraSweet before filing their suit, the court concluded that their claims were barred by the tender rule announced in *Fleming v. United States Postal Service AMF O'Hare*, 27 F.3d 259 (7th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 741, 130 L.Ed.2d 642 (1995). The court was also satisfied that their execution of the release was knowing and voluntary under either a "totality of the circumstances" approach (later adopted by this court in *Pierce v. Atchison, Topeka & Santa Fe Railway Co.*, 65 F.3d 562 (7th Cir.1995)) or the contract interpretation approach, described in *Riley v. American Family Mutual Insurance Co.*, 881 F.2d 368 (7th Cir.1989).

Sorcinelli conceded that the release she signed on April 30, 1991, was valid as far as it went, but she asserted that it was not enforceable against claims that she could not have discovered upon reasonable inquiry that accrued before she signed. The district court found that she knew enough to have investigated further into the question of wage discrepancies, and thus that her claims were barred by the release.

Finally, the district court found that Wagner's pre-release claims were barred, but that her claims relating to discriminatory compensation and benefits arising out of her employment from March 30, 1991, through the last date of her employment on October 5, 1991, were unaffected by the release. Wagner had refused to sign the second release proffered to her, which the court found significant. In spite of its findings with respect to Wagner's post-release claims, the court concluded that class certification was inappropriate, because all four plaintiffs failed the typicality requirement of Fed. R.Civ.P. 23(a). Each release was somewhat different, and each plaintiff presented somewhat different circumstances.

After these rulings, Wagner filed a second amended complaint in which she asserted that she suffered from under-compensation and other sex-based discrimination after March 25, 1991. On the eve of trial, in an order dated August 29, 1995, the district court granted NutraSweet's motion for summary judgment on Wagner's remaining claims. *Wagner v. NutraSweet Company*, 900 F.Supp. 959 (N.D.Ill.1995). The court found, on her compensation claim, that the rate of pay she received during the retention period was calculated based on the salary she had received before March 25, 1991, and thus that the release effectively covered liability for any discrimination regarding the retention pay as well. With respect to her two specific claims of discriminatory treatment, both of which were based on NutraSweet's filling a job position for which she was qualified with a male, the court found that she had offered neither direct evidence of discrimination nor sufficient evidence to raise a genuine claim under the burden-shifting method of proof.

## III

Wagner, Sorcinelli, and Harrison present three principal claims on appeal: first, they assert that the releases should not have been enforced to bar claims that arose prior to the time they were signed; second, they argue that both Wagner and Sorcinelli have valid post-release claims; and third, they argue that the district court abused its discretion in refusing to certify the requested class. Although their claims have much in common, we consider the appeals person by person, since each one presents a somewhat different set of issues.

### A. Harrison

Harrison's only hope for relief is to find a way around the release she signed, because it is undisputed that she did not continue to work for NutraSweet after her job was terminated. This court held in *Pierce*, 65 F.3d 562, that a release is subject to normal state-

law contract defenses and that, to affect federal civil rights claims, it must be both knowing and voluntary in light of the totality of the circumstances. *Id.* at 572. In cases where the plaintiff is specifically seeking to rescind the release, this court has also held that the normal contract rule requiring the return of any consideration received under the contract applies. See *Fleming,* 27 F.3d 259, 260. The "tender" rule does not apply in all cases, however. Among the exceptions recognized in *Fleming* was "the case in which all the plaintiff obtained in exchange for the release was something to which he was already entitled, as distinct from obtaining payment of a disputed or disputable claim." *Id.* at 261. In Harrison's case, the issues reduce to two basic questions: does the summary judgment record clearly show that the release was supported by adequate consideration (relevant both to the contractual defense of want of consideration and to the exception from the tender rule), and do the undisputed facts show that her waiver was knowing and voluntary under all the circumstances?

In the law of contracts, consideration is relatively easy to show. As long as the person receives something of value in exchange for her own promise or detriment, the courts will not inquire into the adequacy of the consideration. *Scholes v. Lehmann,* 56 F.3d 750, 756 (7th Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 673, 133 L.Ed.2d 522 (1995); *Curtis 1000, Inc. v. Suess,* 24 F.3d 941, 945 (7th Cir.1994) ("the traditional rule, in Illinois and elsewhere, is that the law does not inquire into the adequacy of the consideration to support a promise, only its existence."); *White v. Village of Homewood,* 256 Ill.App.3d 354, 195 Ill.Dec. 152, 155, 628 N.E.2d 616, 619 (1993); *Goodwine State Bank v. Mullins,* 253 Ill.App.3d 980, 192 Ill.Dec. 901, 924, 625 N.E.2d 1056, 1079 (1993). Harrison argues that NutraSweet was already committed to giving her the full package of separation benefits that appeared in her letter, and thus that she gained nothing by signing the release that she would not have received in any event. She points to the Separation Guidelines, which appeared to assure redeployment benefits and continuing health benefits, and she claims that the com-

pany intended to furnish outplacement services to everyone as well. Unfortunately, she has no evidence to support the latter proposition. As for the former, since the WARN Act did not apply to the Business Ventures Group, NutraSweet had no prior legal obligation to offer redeployment benefits to those employees. The Guidelines plainly stated that they were to be applied based on all the circumstances relevant to particular employees and that they did not create any right to any benefits. The benefits she received were enough to satisfy the consideration requirement under Illinois law, which we assume applies, and which in any event is typical of other common law based contract laws.

The facts are no more favorable to Harrison on the second question, relating to the knowing and voluntary nature of her waiver. It is clear that a plaintiff may waive a claim under Title VII (and, by extension, under the Equal Pay Act) as part of a voluntary settlement, provided that her consent to the release was voluntary and knowing. See *Riley,* 881 F.2d at 371 (citing *Alexander v. Gardner–Denver Co.,* 415 U.S. 36, 52 n. 15, 94 S.Ct. 1011, 1021 n. 15, 39 L.Ed.2d 147 (1974)). It is undisputed that Harrison attended a meeting at which the benefits package was explained, including the fact that additional benefits would be available to employees who signed the release. There was no evidence that NutraSweet acted purposely to mislead her or that it discouraged her from consulting with an attorney prior to signing the release. Harrison argued that the separation letter misleadingly indicated that in order to obtain any of the benefits, the employee had to sign the release, and that this was simply untrue. This is not, however, what the letter said, and Harrison has not presented any concrete evidence to show that this is how it was presented. The district court therefore did not err in granting summary judgment for NutraSweet on Harrison's claims.

### B. *Sorcinelli*

As noted above, Sorcinelli conceded that her release was valid on its face, and

thus she did not raise any question about the consideration she received or whether her waiver was knowing and voluntary. Instead, she challenges the scope of the release, and argues that it did not cover claims that she could not have known about at the time she signed. Specifically, she asserts that at the time she signed she did not know that her male successor, Mike Vinitsky, was paid much higher bonuses than she had received while they were both performing comparable work. Since this was confidential information, she argues that the reasonable inquiry requirement applied in statute of limitations cases should not be applied by analogy to bar her claim. *Cf. Wolin v. Smith Barney Inc.*, 83 F.3d 847, 853 (7th Cir.1996); *Luckett v. Rent–A–Center*, Inc., 53 F.3d 871, 873 (7th Cir.1995); *Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 450–51 (7th Cir.1990). The problem with this argument is that it mixes up apples and oranges. The statute of limitations starts to run when the plaintiff's cause of action accrues, and accrual occurs either when the plaintiff discovers, or should have discovered, that she has been injured. *Wolin*, 83 F.3d at 852; *Sellars v. Perry*, 80 F.3d 243, 245–46 (7th Cir.1996); *Cathedral of Joy Baptist Church v. Village of Hazel Crest*, 22 F.3d 713, 717 (7th Cir.1994); *Cada*, 920 F.2d at 450. In release cases, the question is not when was the date of accrual, but rather whether the plaintiff is knowingly giving up the right to sue on some claims, or all claims that are in general terms predictable. See *Fair v. International Flavors & Fragrances, Inc.*, 905 F.2d 1114, 1115–16 (7th Cir.1990). When a release is broadly worded, as this one was, to cover all claims, "known and unknown," the plaintiff is giving up the right to sue that she might otherwise have on claims related to her employment that could arise under any law. The waiver is valid if it is knowing and voluntary, as we noted above. No evidence in the record suggests otherwise for Sorcinelli's waiver; summary judgment for NutraSweet was therefore correct.

### C. Wagner

■ Finally, we come to Wagner's claims. Her challenges of discrimination before March 25 fail on grounds similar to Harrison's. Some differences, to be sure, exist.

In Wagner's case, the WARN Act applied to the R & D Group, and thus NutraSweet was under a legal obligation to provide many of the benefits outlined in the Separation Guidelines. However, as noted above, the Separation Guidelines did not provide for outplacement services, which were a part of her actual separation package, and were therefore some consideration for the release that went beyond the company's pre-existing legal duty. More importantly, Wagner received a retention agreement that lasted for more than six months, which her letter makes plain was also part of the overall separation package. Taken together, these two benefits provided consideration for the release she signed.

With respect to the knowing and voluntary nature of the release, Wagner is in a particularly unfavorable position to argue that a genuine issue of fact exists on this record. She was, after all, the top human resources officer in the R & D Group. She helped to design the entire downsizing program that NutraSweet was implementing. Wagner herself testified that, in advising other employees about the separation letters and releases, "we told employees that they could take it to an attorney. There was no pressure on them to sign anything, go and talk about it with outside counsel, make your decision." Furthermore, her reaction to the August 1 release showed beyond any doubt that she knew how to say no when she wanted to. Her claims for Title VII and Equal Pay Act violations accruing before she signed the March 25, 1991 release were correctly dismissed.

Wagner's post-March 25 claims, however, stand on a different footing. She worked for NutraSweet from the time she signed the release until October 5, 1991, and her second amended complaint clearly alleges violations based on that time period. Nothing in the March 25, 1991, release suggests that it purported to be prospective, even if such a thing were possible, and NutraSweet's action in trying to obtain her signature on a second release speaks volumes about its own opinion on the matter. See *Adams v. Philip Morris, Inc.*, 67 F.3d 580, 583 (6th Cir.1995) (citing *Alexander*, 415 U.S. at 51–52, 94 S.Ct. at

1021); *Riley*, 881 F.2d at 372 n. 6; *Cange v. Stotler & Company, Inc.*, 826 F.2d 581, 594–95 (7th Cir.1987). *Cf. Brooklyn Savings Bank v. O'Neil*, 324 U.S. 697, 710, 65 S.Ct. 895, 903, 89 L.Ed. 1296 (1945) ("[C]ourts have uniformly held that contracts tending to encourage violation of laws are void as contrary to public policy."). At oral argument, counsel for NutraSweet suggested to us that the August 1 release was merely a matter of bookkeeping that was not strictly necessary, but we are not persuaded. The dates were different from the March 25 release; the content of Wagner's employment was different; and we would be loath to find even an attempt at a prospective release without language far clearer than we see in the March 25 document. The district court, too, found that Wagner's retention period claims were not barred by the original release.

The district court thought, nevertheless, that Wagner's post-release compensation claims were barred because the rate of pay she earned during that time period was based on her earlier salary, as to which she had released all claims. This holding misunderstands the nature of discrimination claims based on repeated acts, such as the receipt of a weekly or monthly salary check. The Supreme Court held in an analogous situation in *Bazemore v. Friday*, 478 U.S. 385, 395–96, 106 S.Ct. 3000, 3006, 92 L.Ed.2d 315 (1986), that "[e]ach week's paycheck that delivers less to a black than to a similarly situated white is a wrong actionable under Title VII, regardless of the fact that this pattern was begun prior to the effective date of Title VII." See also *Chambers v. American Trans Air, Inc.*, 17 F.3d 998, 1003 (7th Cir.), *cert. denied*, —— U.S.——, 115 S.Ct. 512, 130 L.Ed.2d 419 (1994) ("[p]ay increases are typically continuing violations, because each pay check at a discriminatory rate is seen as the basis for a separate claim"). Applying these cases, we hold that Wagner's compensation claims lasted throughout her retention period, as on this record we must assume that each paycheck she received was affected by the discriminatory system she alleges was in place.

In addition to the compensation claims, Wagner raised two sex discrimination claims relating to the post-release period, the first relating to an opportunity to compete for an open director position in the CSD Group, which was filled by Mike Vinitsky, and the second relating to NutraSweet's act in filling her former position of Director of Human Resources in R & D with her male subordinate, Wayne Tompkins. As noted above, the district court granted summary judgment to NutraSweet on both these claims. Wagner does not pursue them on appeal, and thus we have no occasion to address them.

### D. *Class Certification*

We review the district court's denial of class certification for abuse of discretion. *RCPA v. City of Chicago*, 7 F.3d 584, 596 (7th Cir.1993); *Harriston v. Chicago Tribune Co.*, 992 F.2d 697, 703 (7th Cir.1993); *Hewitt v. Joyce Beverages of Wisconsin, Inc.*, 721 F.2d 625, 627 (7th Cir.1983). In this case, however, the court's decision to deny certification was affected by his ruling, which we have reversed, that Wagner's post-release claims were all without merit. We therefore also vacate the court's order denying certification so that it can be reviewed in light of our ruling here. As a female manager challenging the compensation structure at NutraSweet during the relevant time period, Wagner potentially stands in the same position as other women managers (of whom she suggests in her briefs there are more than sixty remaining). The court on remand may well conclude that Wagner satisfies the four criteria of Rule 23(a): numerosity, commonality, typicality, and adequacy of representation. We note only that the court's concern with NutraSweet's defense based on the releases went too far. Typicality under Rule 23(a)(3) should be determined with reference to the company's actions, not with respect to particularized defenses it might have against certain class members. See *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir.1992), *cert. denied*, 506 U.S. 1051, 113 S.Ct. 972, 122 L.Ed.2d 127 (1993). See generally, 7A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE & PROCEDURE § 1764 (1986). Indeed, the releases may prove to be far less significant for the class who were present at NutraSweet *after* the March 25 separation letters, because that

class will include more of the "survivors" who never had to sign a release. We do not mean to pre-determine this issue here, because it is something better entrusted to the discretion of the district court on remand. With the issues narrowed so significantly as a result of the district court's prior efforts, both Wagner's individual claim and her effort to represent a class for the compensation claim will be far more manageable to resolve.

The judgment of the district court is AFFIRMED in part, and REVERSED and REMANDED in part for further proceedings consistent with this opinion.