Richard **GOEPFERT**, Plaintiff,

v.

**TRUSTMARK INSURANCE COMPANY, Hyundai Construction Equipment Inc. Employee Health Plan, Hyundai Construction Equipment U.S.A., Inc.,**[1] **and Disability RMS, Defendants.**

No. 05C1132.

United States District Court, E.D. Wisconsin.

March 21, 2008.

---

**1.** As requested, I will amend the caption to reflect Hyundai Construction Equipment U.S.A., Inc.'s correct name.

Douglas P. Dehler, Shepherd Finkelman Miller & Shah LLC, Milwaukee, WI, for Plaintiff.

Steven E. Cyranoski, Michael Best & Friedrich LLP, Frederic A. Mendelsohn, Burke Warren MacKay & Serritella PC, Chicago, IL, for Defendants.

## DECISION AND ORDER

ADELMAN, District Judge.

Plaintiff Richard Goepfert, a former employee of defendant Hyundai Construction Equipment U.S.A., Inc. ("HCE"), brought this action alleging that defendants HCE, Hyundai Construction Equipment, Inc. Employee Group Long Term Disability Plan ("the Plan"), Trustmark Insurance Co. ("Trustmark"), and Disability Reinsur-

ance Management Services, Inc. ("DRM") violated the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 et seq., by denying plaintiff's application for long-term disability ("LTD") benefits stemming from his diagnosis of early onset Alzheimer's disease. HCE and the Plan now move for summary judgment, contending plaintiff signed a "Separation Agreement and General Release" ("the Release") that bars him from pursuing any claims against HCE and its affiliates, including claims under ERISA.[2]

## I. FACTS

HCE hired plaintiff as a Marketing Manager on September 22, 1997. In late 2000 or early 2001, plaintiff began to experience "difficulty remembering simple tasks, and ... an inability to focus." (Am. Compl.¶ 9.) On April 27, 2001, HCE terminated plaintiff. That same day, plaintiff signed a "Separation Agreement and General Release" (the "Release"). According to the Release, plaintiff received a severance package, consisting of a payment of $18,753.25 (equal to 90 days' wages based upon plaintiff's annual salary), payment for all unused vacation days, the continuation of health care coverage through July 31, 2001, and title to plaintiff's company automobile. In consideration for the severance package, the Release provided, in pertinent part, that:

> Employee irrevocably and unconditionally releases and discharges the Company, its officers, shareholders, employees, affiliates, parents, successors and assigns (separately and collectively the "Released Parties"), jointly and individually, from any and all claims, obligations, demands, damages, causes of action of any nature or kind whatsoever, known or unknown, which Employee ... ha[s] or

may have against the Released Parties based upon, relating to, or arising from the creation, existence or termination of the employer/employee relationship, including but not limited to claims of discrimination under any Federal, state or local law, rule or regulation, whether those claims are past or present, whether they arise from equity, common law, or statute, whether they arise from labor laws or discrimination laws, including (without limitation) ... the Employee Retirement Income Security Act of 1974, as amended ..., or any other law, rule or regulation.

(Maher Aff. Ex. 3 ¶ 5.) The Release also acknowledged that plaintiff understood that he could seek counsel prior to signing the agreement, had twenty-one days to look over the Release before signing it, and had seven days thereafter to revoke. The Release also provided that it was governed by Illinois law.

After HCE terminated him, plaintiff became increasingly ill and saw several physicians over the next two years. In 2003, a doctor diagnosed plaintiff with early-onset Alzheimer's disease. In June 2004, plaintiff submitted a claim for long-term disability benefits to Trustmark under HCE's Disability Plan. Upon the recommendation of Disability RMS, Trustmark denied plaintiff's claim, citing insufficient "medical documentation to support total disability as of [his] last day worked." (Am. Compl. Ex. A at 3; Am. Compl. ¶ 17.) After exhausting the administrative review procedures, plaintiff brought this action.

## II. ANALYSIS

### A. Legal Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to in-

---

**2.** In October 2007, defendants filed additional motions for summary judgment. I do not address these motions here.

terrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A genuine issue of material fact exists "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Specific evidence must show there is a genuine issue for trial; there must be more than a metaphysical doubt. *Id.* at 586–87, 106 S.Ct. 1348. All inferences are drawn in the light most favorable to the non-moving party. *Metro. Life Ins. Co. v. Johnson*, 297 F.3d 558, 561–2 (7th Cir.2002).

## B. Scope of Release

■■■ Defendants argue that the Release bars plaintiff's ERISA claim. In interpreting the Release, I consider its language and attempt to ascertain the parties' intent. *See Chi. Transit Auth. v. Yellow Cab Co.*, 110 Ill.App.3d 379, 66 Ill. Dec. 120, 442 N.E.2d 546, 550 (1982). A release covers "all claims of which a signing party has actual knowledge or that he could have discovered upon reasonable inquiry." *Fair v. Int'l Flavors & Fragrances, Inc.*, 905 F.2d 1114, 1116 (7th Cir.1990). The operative question is whether the employee gave up the right to sue on claims that are "in general terms predictable." *Wagner v. NutraSweet Co.*, 95 F.3d 527, 533 (7th Cir.1996). "[I]n general terms predictable" does not require the employee to know specifically which claims are being released. *See id.* (plaintiff waived right to bring a Title VII suit even though it was impossible for plaintiff to discover differences in salary bonuses based on sex). Rather, "[w]hen a release is broadly worded . . . to cover all claims, 'known and unknown,' the plaintiff is giving up the right to sue that she might

otherwise have on claims related to her employment that could arise under any law." *Id.* This may include claims arising under ERISA. *See Fair*, 905 F.2d at 1116 ("[W]e see no reason why the covenant not to sue does not apply to [the] ERISA claim as well."); *Howell v. Motorola, Inc.*, No. 03–5044, 2005 WL 2420410 (N.D.Ill. Sept.20, 2005); *Maloney v. R.R. Donnelley & Sons Co.*, No. 97–8890, 1999 WL 58551 (N.D.Ill. Feb.3, 1999).

On its face, the Release expressly covers plaintiff's ERISA claim. The Release applies to *"any and all claims . . ., known or unknown,* which Employee . . . ha[s] or may have . . .*, based upon, relating to, or arising from the creation, existence or termination of the employer/employee relationship, including but not limited to . . . the Employee Retirement Income Security Act of 1974."* (Maher Aff. Ex. 3 ¶ 5 (emphasis added).) Thus, even though plaintiff did not know about the ERISA claim at the time of signing, the parties clearly contemplated that the Release cover all claims, known or unknown, past, present or future. *See Chi. Transit Auth.*, 66 Ill. Dec. 120, 442 N.E.2d at 551 (release covered claims plaintiffs "hereafter may have," which language would be unnecessary if the parties did not contemplate the possible future accrual of claim). Thus, plaintiff's ERISA claim was "in general terms predictable" and within the scope of the Release.

## C. The Plan as HCE Affiliate

■■■ Plaintiff also argues that the Plan is not an "affiliate" of HCE and is therefore not covered by the Release. When the terms of a release apply to "agents, employees, officers, directors, successors and assigns" and the terms do not suggest that the release applies only when the company is acting in certain capacities, the release covers the employer in any of

its capacities. *Fair*, 905 F.2d at 1115. Additionally, ERISA does not require an employee benefit plan to be explicitly named in an exculpatory agreement even though suit may be commenced against the plan as an entity. *Howell*, 2005 WL 2420410, at *7 (citing 29 U.S.C. § 1132(d)).

■ As noted above, HCE's Release explicitly covers ERISA claims against HCE, "its officers, shareholders, employees, affiliates, parents, successors and assigns." (Maher Aff. Ex. 3 ¶ 5 (emphasis added)). The term "affiliate" signifies a close association with another entity, a branch organization, or a business concern owned or controlled in whole or in part by another concern. *Random House Webster's College Dictionary* 22 (2d ed.1997). According to plaintiff's amended complaint, HCE is the sponsor and administrator of the Plan, fully named Hyundai Construction Equipment, Inc. Employee Group Long Term Disability Plan. The Plan is an entity established by HCE, acting in its capacity as an employer seeking to provide benefits to its employees, would not exist separate and apart from HCE, and therefore is closely associated with HCE. Moreover, given that ERISA specifically provides for suit on ERISA claims against a benefit plan as a separate entity, *see* 29 U.S.C. § 1132(d), and the Release in the present case expressly includes ERISA claims within its scope, it seems clear that the Release would therefore apply to HCE's employee benefit plan. *See Howell*, 2005 WL 2420410, at *6–7 ("Defendants had no obligation to mention the [ERISA] Plan by name in the Release language, as claims relating to that Plan would be included in the covered ERISA claims."). Thus, the Plan is an "affiliate" of HCE for purposes of the Release, and claims against the Plan are within the scope of the Release.

## D. Validity of Release

■ Plaintiff also argues that he did not knowingly and voluntarily enter into the Release. Employees can waive federal civil rights in private employer/employee settlements. *See Alexander v. Gardner–Denver Co.*, 415 U.S. 36, 52, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974); *Pierce v. Atchison, Topeka & Santa Fe Ry. Co. (Pierce I)*, 65 F.3d 562, 570 (7th Cir.1995); *Laniok v. Advisory Committee of Brainerd Mfg. Co. Pension Plan*, 935 F.2d 1360, 1367–68 (2d Cir.1991); *Riley v. Am. Family Mut. Ins. Co.*, 881 F.2d 368, 371 (7th Cir.1989). However, to be effective a waiver must be knowing and voluntary so as to prevent the "involuntary or uninformed compromise of federal rights." *Pierce I*, 65 F.3d at 571.

■ An employee seeking to invalidate a release must "challenge specifically his voluntary and knowing consent to the release." *Pierce I*, 65 F.3d at 572. The Seventh Circuit uses the "totality of circumstances" approach in determining the validity of a waiver of federal civil rights. *Id.* This approach constitutes a middle ground between a rule that prohibits private waivers and one that restricts a court's inquiry to state-made contract law. *Pierce v. Atchison, Topeka & Santa Fe Ry. Co. (Pierce II)*, 110 F.3d 431, 436–38 (7th Cir.1997). Thus, where a waiver of federal rights is at issue, a court may not limit its inquiry into the factors that determine whether a contract is valid under state law: a waiver of federal civil rights requires something more. *Id.* at 437; *Pierce I*, 65 F.3d at 571 ("[C]reation of a federal rule rather than absorption of a state rule is appropriate where ... the rights of the litigants and the operative legal policies derive from a federal source.").

To this end, the Seventh Circuit has directed courts to consider such factors as:

(1) the employee's education and business experience; (2) the employee's input in negotiating the terms of the settlement; (3) the clarity of the agreement; (4) the amount of time the employee had for deliberation before signing the release; (5) whether the employee actually read the release and considered its terms before signing it; (6) whether the employee was represented by counsel or consulted with an attorney; (7) whether the consideration given in exchange for the waiver exceeded the benefits to which the employee was already entitled by contract or law; and (8) whether the employee's release was induced by improper conduct on the defendant's part.

*Pierce I*, 65 F.3d at 571 (footnote excluded). Further, courts may not simply tally these factors quantitatively. *Maloney*, 1999 WL 58551, *6. To employ such a "rigid, formalistic" procedure would be inconsistent with the reason for the additional scrutiny given to waivers of federal rights—to determine whether the employee has "a clear understanding of the ramifications of [his or] her actions." *Id.*

■ In the present case, several of the above factors, when analyzed outside the context of plaintiff's particular situation, weigh in favor of defendants. For example, plaintiff has a Master's Degree in Business Administration, which would suggest familiarity with business matters. Further, plaintiff had twenty-one days to deliberate before signing the Release, and seven days after signing to revoke his consent. Additionally, plaintiff was advised to consult with counsel or another third party prior to signing. Further, there is no evidence that defendants pressured plaintiff into signing the Release. Nor does the fact that plaintiff chose not to take twenty-one days to consider the Release or may not have consulted with counsel render it invalid. The possibility that plaintiff may not have read the re-

lease also does not invalidate it. The Release was written clearly, plaintiff acknowledged by signing the Release that he read and understood it, and he received consideration for it in the form of continuing salary and other benefits.

Nonetheless, I am not obligated to decide the validity of the release on these eight factors alone; my inquiry is including, but "not limited to" them. *Pierce I*, 65 F.3d at 571; *see also Riley*, 881 F.2d at 374 (stating that a court may inquire into the subjective intent of a waiving party if the party could not appreciate the consequences of the release). While the Pierce factors weigh against plaintiff, they fail to account for the overarching issue of Plaintiff's early onset Alzheimer's diagnosis and the deficiencies accompanying the disorder. Any effect the Alzheimer's disease had on plaintiff at the time he signed the Release is relevant not only to the "totality of the circumstances" analysis, but also to whether Plaintiff "had the capacity to execute the [R]elease knowingly and voluntarily." *See Rivera–Flores v. Bristol–Myers Squibb Caribbean*, 112 F.3d 9, 12–13 (1st Cir.1997) (looking outside of the "totality of circumstances" approach to determine whether an individual with dysthymia and post-traumatic stress disorder had the capacity to sign a release). Under such a question, more than the "[m]ere evidence of diagnostic labels without content tying them to capacity to give valid consent is [necessary] to create an issue as to the consequences of the disorders on an individual's capacity to give valid consent." *Id.*

■ Plaintiff has provided ample evidence to create a genuine issue of material fact as to whether he knowingly and voluntarily consented to the Release or even had the capacity to do so. According to the affidavit of Dr. Harsch, Plaintiff's Alzheimer's disease manifested itself prior to

his termination from HCE. Alzheimer's disease involves cognitive impairment, and the first areas of the brain to be damaged control memory, language, and reasoning. These changes result in the deterioration of cognitive abilities, including memory loss and poor judgment leading to bad decisions. And defendants have acknowledged that plaintiff experienced symptoms consistent with such deterioration prior to his termination. Thus, while the Pierce factors may cut in favor of defendants, the issue still remains whether plaintiff had "a clear understanding of the ramifications of [his] actions," and I therefore cannot conclude at this time that plaintiff knowingly and voluntarily waived his rights.

**Therefore,**

**IT IS ORDERED** that defendants' motion for summary judgment is DENIED.