In the

# United States Court of Appeals

## For the Seventh Circuit

No. 08-1346

COLLETTE HAMPTON,

*Plaintiff-Appellant,*

*v.*

FORD MOTOR COMPANY,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 06 CV 6720—**George W. Lindberg**, *Judge.*

ARGUED NOVEMBER 3, 2008—DECIDED APRIL 6, 2009

Before KANNE, EVANS, and SYKES, *Circuit Judges*.

KANNE, *Circuit Judge.* Collette Hampton worked the night shift at Ford Motor Company's Chicago assembly plant, where she was allegedly harassed and discriminated against by her coworkers. On October 16, 2006, she accepted a voluntary buyout package, agreeing to terminate her employment with Ford in exchange for $100,000. As one condition of the package, Ford required Hampton to release any and all claims against Ford related to her

employment and arising prior to the execution date. After signing the release and cashing the check, Hampton filed a lawsuit against Ford based on conduct occurring prior to October 16, 2006. The district court granted summary judgment in Ford's favor, finding that the buyout agreement validly released her claims; Hampton appeals that judgment. We agree with Ford that Hampton knowingly and voluntarily signed a release that encompassed her claims. Therefore, summary judgment in Ford's favor is warranted.

## I. BACKGROUND

It is no secret that the American automotive industry has had its share of difficulties in recent years. In 2006, facing a deteriorating market for American automobiles, the Ford Motor Company agreed with the United Auto Workers[1] to offer a one-time, systemwide buyout to certain qualified hourly employees. The goal of the program was to reduce Ford's workforce without imposing layoffs and to provide its employees with an incentive to resign voluntarily. The buyout program included a variety of packages, ranging from encouraging early retirement to providing a subsidized college education.

---

[1] The UAW is officially titled the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America.

*A. The STEP Program and Waiver Agreement*

The buyout package at issue in this case was called the Special Termination of Employment Program (STEP). Under the STEP, an eligible employee who agreed to terminate his or her employment received a lump sum payment of $100,000, minus the applicable withholdings. To enroll, Ford required the employee to sign an Application and Waiver Agreement ("the Waiver"), in which the employee released any and all claims against Ford as a condition of receiving the $100,000. The Waiver stated, in pertinent part:

> I have decided voluntarily to terminate my employment under the terms and conditions of the STEP. In consideration of the benefits to be provided as described in the summary, I waive and release any and all rights or claims I may have against the Ford Motor Company, its agents or employees and agree not to institute any proceedings of any kind against Ford Motor Company, its agents or employees relating in any way to my employment or the termination of my employment, provided, however, I do not waive my rights or claims under the Age Discrimination in Employment Act.
>
> This waiver does not waive any rights or claims that may arise after this waiver is signed or if it is not permitted by law. . . .
>
> I hereby acknowledge that I am voluntarily applying for this STEP payment. . . . I have read and reviewed this STEP Application and Waiver Agreement carefully and to my satisfaction.

The terms and scope of this Waiver are at the center of this case.

Ford notified all eligible employees of the buyout program well in advance of the enrollment period. Ford also provided its employees with written materials describing the available packages and the procedure for participating, along with a copy of the Waiver. According to these documents, an employee could enroll in the buyout any time between October 16 and November 27, 2006, and the effective termination date for participating employees would be January 1, 2007. If an employee signed up, but failed to complete the termination process, Ford would consider the employee to have withdrawn the STEP application. Thus, the employee had the option to rescind or withdraw her application any time before December 31, 2006.

### B.  Plaintiff-Appellant Collette Hampton

In early 2004, Collette Hampton began working the night shift on the "chassis line" at Ford's Chicago assembly plant. Beginning that summer, Hampton allegedly suffered ongoing sexual harassment and discrimination by her coworkers. In May 2005, after retaining legal counsel, she submitted a statement concerning her alleged harassment to Ford management. Ford investigated her claims and found them to be uncorroborated, yet it agreed to move Hampton to the "motor line" in mid-August 2005. Hampton did not experience any harassment after switching job duties. On December 7, 2005, she filed a Charge of Discrimination with the Illinois Depart-

ment of Human Rights and the Equal Employment Opportunity Commission alleging that she was harassed and discriminated against by her coworkers on the "chassis line."

In early August 2006, while awaiting response to her EEOC charge, Hampton learned of Ford's voluntary buyout program and decided she wanted to participate. Toward the end of August, Ford planned to lay off a number of employees—including Hampton—in a seniority-based reduction in force. Faced with upcoming unemployment, Hampton naturally considered the buyout to be an attractive alternative. She asked her UAW representative to inquire about her eligibility and, if necessary, negotiate with Ford to allow her to participate.

On October 2, 2006, Ford sent Hampton a letter confirming that she would be eligible for the STEP and notifying her of an informational meeting on October 10, which she did not attend. Hampton also received written materials explaining the details of the buyout, including the effect of receiving a STEP payment and the procedure for applying. According to the materials, Hampton could apply for the STEP at any time between October 16 and November 27, 2006. Ford also directed its employees to pose any questions about the STEP to the personnel/labor relations department or their UAW representative. Following Hampton's initial conversation with her UAW representative regarding her eligibility, she did not speak to anyone else about the buyout.

On the first day of the application period, Hampton applied for the STEP and signed the Waiver. Hampton

testified at her deposition that she unsuccessfully attempted to contact her attorney before signing. However, representatives from Ford's human resources department and the UAW, each of whom witnessed Hampton's signature and also signed the Waiver, were available to discuss the agreement and answer additional questions. Hampton later provided her attorney with a copy of the executed agreement. Hampton's effective termination date was January 1, 2007, after which she received and promptly cashed a check for $64,429—the $100,000 STEP payment, less applicable withholdings.

On November 17, 2006, a month after Hampton signed the Waiver, but before the application enrollment period concluded, the EEOC issued her a right-to-sue letter based on her December 2005 charge. On December 6, 2006, she filed the instant lawsuit in the Northern District of Illinois, alleging sexual discrimination and harassment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1).

Following discovery, Ford filed a motion for summary judgment, in which it denied the merits of Hampton's claims and argued that she waived her claims by signing the Waiver on October 16, 2006. On January 7, 2008, the district court granted summary judgment in Ford's favor. The court did not reach the substance of Hampton's Title VII claims because it determined that she had released them as a matter of law. Hampton now appeals.

## II. ANALYSIS

The only issue on appeal is whether the district court properly granted summary judgment against Collette Hampton. We review the district court's grant of summary judgment *de novo* and construe all facts and reasonable inferences in the light most favorable to Hampton. *Sycamore Indus. Park Assocs. v. Ericsson, Inc.*, 546 F.3d 847, 850 (7th Cir. 2008). Summary judgment is proper when the evidence on file demonstrates that there is no genuine issue as to any material fact. Fed. R. Civ. P. 56(c). A disputed fact is "material" if it might affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Hampton claims that she did not release her Title VII claims by signing the Waiver on October 16, 2006. She propounds an assortment of arguments to support this conclusion, each of which falls within one of two separate issues: (1) whether the parties intended for the Waiver to cover Hampton's Title VII claims; and (2) whether she executed the Waiver knowingly and voluntarily. We address both arguments and find against Hampton on each. First, she signed an agreement releasing any and all claims related to her employment that arose before October 16, 2006. Her Title VII claims fit that description, and the Waiver therefore encompassed them. Second, she entered the Waiver knowingly and voluntarily. Therefore, we agree with the district court's decision to grant summary judgment in Ford's favor.

*A.  The Scope of the STEP Waiver Agreement*

Hampton first contends that she did not intend for the Waiver to bar her Title VII claims. She provides the following reasons to support this assertion: she filed an EEOC charge reporting the alleged harassment prior to signing the Waiver; she could not file a lawsuit until she received a right-to-sue letter; her lawyer was not involved in negotiating the waiver; the waiver was not "expressly conditioned" on the release of her Title VII claim; and the waiver agreement was ambiguous. A release is simply a particular type of contract, and Illinois law governs questions regarding the parties' intent and the proper construction of the agreement. *See Newkirk v. Vill. of Steger*, 536 F.3d 771, 774 (7th Cir. 2008).

Our primary objective in construing a contract is to give effect to the intent of the parties. *Vill. of S. Elgin v. Waste Mgmt. of Ill., Inc.*, 810 N.E.2d 658, 670 (Ill. App. Ct. 2004). Illinois follows the objective theory of intent, whereby the court looks first to the written agreement and not to the parties' subjective understandings. *Newkirk*, 536 F.3d at 774. "The status of a document as a contract depends on what the parties express to each other and to the world, not on what they keep to themselves." *Skycom Corp. v. Telstar Corp.*, 813 F.2d 810, 814-15 (7th Cir. 1987). Thus, we must not interpret contractual language in a way contrary to the plain, obvious, and generally accepted meaning of its terms. *Krilich v. Am. Nat'l Bank & Trust Co. of Chi.*, 778 N.E.2d 1153, 1164 (Ill. App. Ct. 2002).

A standard principle of contract law is that we will not disturb an unambiguous agreement. Where a contractual release is clear and explicit, we must enforce it as written. *Rakowski v. Lucente*, 472 N.E.2d 791, 794 (Ill. 1984); *Farmers Auto. Ins. Ass'n v. Wroblewski*, 887 N.E.2d 916, 923 (Ill. App. Ct. 2008). A contract is ambiguous if its terms may reasonably be interpreted in more than one way, *Krilich*, 778 N.E.2d at 1164, but it is not rendered ambiguous simply because the parties disagree upon its proper construction, *Whiting Stoker Co. v. Chi. Stoker Corp.*, 171 F.2d 248, 250-51 (7th Cir. 1948). Rather, an ambiguous contract is "an agreement obscure in meaning, through indefiniteness of expression, or having a double meaning." *Id.* at 251.

In Hampton's case, we need look no further than the Waiver. According to its language, in exchange for the STEP benefits Hampton agreed to release "any and all rights or claims" she may have had against Ford, and not to institute "any proceedings of any kind" against Ford relating "in any way" to her employment. The Waiver then expressly stated that Hampton did *not* waive "any rights or claims that may arise after" she signed the Waiver.

First, we find no ambiguity in the Waiver. Both our court and Illinois courts have determined that releases with similar language were unambiguous. *See, e.g.*, *Pierce v. Atchison, Topeka & Santa Fe Ry. Co.* (*Pierce I*), 65 F.3d 562, 568 (7th Cir. 1995) (finding agreement that released "any and all claims of any nature" sufficient to release plaintiff's federal claim); *Rakowski*, 472 N.E.2d at 794 (finding

release of "any and all claims" unambiguous). Hampton argues that the parties did not intend for the Waiver to release all claims "in the usual sense" because it was intended as a company-wide buyout, printed on a form agreement, with no negotiation between the parties. But these extrinsic circumstances do not affect the plain meaning of the Waiver's language and provide us with no reason to believe that the parties "couldn't have meant what they seem to have said." *Pierce I*, 65 F.3d at 568 (quotations omitted).

Second, the scope of the Waiver's "any and all" language encompassed Hampton's discrimination claims. A general release typically covers "all claims of which a signing party has actual knowledge or that he could have discovered upon reasonable inquiry." *Fair v. Int'l Flavors & Fragrances, Inc.*, 905 F.2d 1114, 1116 (7th Cir. 1990) (quotations omitted); *see also Wagner v. NutraSweet Co.*, 95 F.3d 527, 533 (7th Cir. 1996). Neither party disputes that Hampton was aware of the alleged wrongful acts prior to the date she signed the Waiver. Her claims fall within the Waivers's scope unless Hampton presents a persuasive reason for construing the Waiver to exclude them.

Hampton's primary assertion is that the Waiver did not release her Title VII claims because they did not "arise" until after she received her EEOC right-to-sue letter allowing her to file suit in federal court. Hampton is incorrect. *See, e.g., Pierce I*, 65 F.3d at 567-68 (holding that a general release covered plaintiff's claim, even though he had already filed an EEOC charge). The natural meaning of the term "arise" in the Waiver is that Ford intended

for Hampton to release any potential claims based on conduct that occurred prior to the execution date. *Cf. Wagner*, 95 F.3d at 533 ("In release cases, the question is not when was the date of accrual [for the statute of limitations], but rather whether the plaintiff is knowingly giving up the right to sue on some claims, or all claims that are in general terms predictable."); *Capocy v. Kirtadze*, 183 F.3d 629, 634 (7th Cir. 1999) ("Illinois courts read general releases to include claims of which the parties were aware at the time of the release's execution."); *Myers v. Health Specialists, S.C.*, 587 N.E.2d 494, 499 (Ill. App. Ct. 1992) (noting that no justiciable claim "arose" until plaintiff suffered injury or a real threat thereof). Filing an EEOC charge and awaiting a right-to-sue letter do not alter that the conduct giving rise to Hampton's Title VII claims occurred before she signed the Waiver, and she was well within her rights to voluntarily release those claims.

Furthermore, Hampton agreed not only to waive any claims that arose before signing the Waiver, but also "not to institute any proceedings *of any kind* against Ford." The Title VII administrative scheme is distinct from a federal lawsuit. Although filing a charge with the EEOC is a prerequisite to bringing a federal action, *see* 42 U.S.C. § 2000e-5(b), such a charge does not automatically institute a lawsuit. In fact, a component of Congress's original plan in drafting Title VII and creating the EEOC was to facilitate conciliation and settlement. *See id*. A mere two months after signing the Waiver, Hampton filed a complaint in the district court alleging wrongdoing that occurred prior to the execution date. In so doing, she

initiated a proceeding in violation of the clear terms of the Waiver.

Hampton's remaining arguments regarding the scope of the Waiver are unpersuasive. Ford's failure to refer expressly to Hampton's Title VII claims does not exclude them from the Waiver's scope; a party need not enumerate the specific claims an employee is waiving in a general release. *See Wagner*, 95 F.3d at 533; *Constant v. Cont'l Tel. Co. of Ill.*, 745 F. Supp. 1374, 1380 (C.D. Ill. 1990); *Rakowski*, 472 N.E.2d at 794. The Waiver also expressly excluded claims under the ADEA, which provides further support that it *included* all other claims. Next, Hampton suggests that Ford provided no consideration for relinquishing her Title VII claims, but she fails to explain why $100,000 does not qualify. Finally, despite her unfounded assertions that the Waiver was a contract of adhesion, Hampton does not allege that she signed the Waiver under duress or that it was otherwise invalid under state law. Therefore, we find that the Waiver unambiguously covered any and all claims arising prior to the date Hampton signed, including her discrimination claims.

B.  *Validity of the STEP Waiver Agreement Under Federal Law*

An employee may waive or release a Title VII claim. *Wagner*, 95 F.3d at 532. For a release affecting a federal right to be valid, it must not only be valid under state law, but it must also be knowing and voluntary. *See*

*Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 52 n.15 (1974); *Pierce I*, 65 F.3d at 570. For us to reach this issue, however, the party challenging the release "must come forward with specific evidence sufficient to raise a question as to the validity of the release." *Pierce v. Atchison Topeka & Santa Fe Ry. Co.* (*Pierce II*), 110 F.3d 431, 438 (7th Cir. 1997).

Hampton provides a litany of circumstances that allegedly led her to believe that she was not releasing her Title VII claims. Notably missing, however, is a direct assertion that she did not read or understand the Waiver. Despite this, we believe that Hampton's scattered allegations regarding the circumstances surrounding the Waiver are sufficient for us to reach the issue of whether she entered it knowingly and voluntarily. Those claims include, among others, that the document was generic and offered to thousands of other Ford employees; that her lawyer did not review the Waiver before she signed it; that she was not allowed to take a copy of it home before she signed it; that there were no "real negotiations"; and that neither Ford nor the UAW explained the release to her.

To determine whether a party entered a release knowingly and voluntarily, we must examine the totality of the circumstances surrounding its execution and consider a number of factors, including, but not limited to:

> (1) the employee's education and business experience; (2) the employee's input in negotiating the terms of the settlement; (3) the clarity of the agreement; (4) the amount of time the employee had for deliberation before signing the release;

(5) whether the employee actually read the release and considered its terms before signing it; (6) whether the employee was represented by counsel or consulted with an attorney; (7) whether the consideration given in exchange for the waiver exceeded the benefits to which the employee was already entitled by contract or law; and (8) whether the employee's release was induced by improper conduct on the defendant's part.

*Pierce I*, 65 F.3d at 571 (footnote omitted).

Applying these factors to Hampton's circumstances, we conclude that she entered the Waiver knowingly and voluntarily. Hampton graduated from high school, completed some college courses, and later took paralegal classes that included, ironically, a course in contracts. She has no difficulty reading, and as we stated above, the agreement was clear and unambiguous. And just above Hampton's signature, the Waiver provided that she read and reviewed the agreement carefully.

Hampton had ample time to consider whether to sign the Waiver. Ford advertised the buyout program well in advance, provided written materials to its employees, and even held a meeting to discuss the various options. Ford then scheduled a period of nearly six weeks in which an interested employee could enroll. Hampton, apparently eager to receive the STEP payment, asked her UAW representative to confirm her eligibility and then chose to sign up on the first day. She also had approximately one additional month after the enrollment period ended to withdraw or rescind the agreement.

Hampton was represented by an attorney at the time she signed the Waiver. Although her attorney was not involved in negotiating its terms, nothing prevented Hampton from consulting him before signing, and Ford did not discourage her from doing so; Hampton even testified that she unsuccessfully attempted to reach him. Hampton provides no legal authority for her assertion that Ford had a duty to contact her attorney before she signed the Waiver. Two parties to a dispute may discuss and settle their claims directly, even if represented by counsel. *See* Model Rules of Prof'l Conduct R. 4.2 cmt. 4. Furthermore, Hampton showed the Waiver to her attorney prior to her last day at Ford, within the time when she could have rescinded it.

As to the remaining factors, Ford provided consideration for Hampton's release, to the tune of a $100,000 cash payment. Hampton alleges no improper conduct on Ford's part, and we agree that the company committed none. The only factor that arguably swings in Hampton's favor is that she had no input regarding the Waiver's terms because Ford offered all qualified employees the same Waiver. However, nothing indicates that these terms were unreasonable or unfair. Further, Hampton signed the Waiver in front of a UAW representative, and she did not ask for assistance, clarification, or more favorable terms. She was well aware of her pending EEOC charge and was free to request additional consideration for releasing any Title VII claims. For these reasons, we find that Hampton entered the Waiver knowingly and voluntarily.

Last, we should also note that Hampton has not offered to return to Ford the consideration she received for

signing the Waiver. Because we have determined that her Title VII claims fall within the scope of the Waiver, her only means to pursue those claims is if the Waiver were invalid and rescinded. To the extent that Hampton is asking for rescission, however, she must return—or at least offer to return—the consideration she received under the contract. *See Fleming v. U.S. Postal Serv. AMF O'Hare*, 27 F.3d 259, 260-61 (7th Cir. 1994). No exception to the tender rule exists in this case, and Hampton has neither returned nor offered to return $64,429 to Ford. Consequently, her challenge must fail for this additional reason.

### III. CONCLUSION

For the above reasons, we find no genuine issue of material fact regarding the validity or scope of the STEP Waiver Agreement. The Waiver unambiguously encompassed Hampton's Title VII claims, and she executed it knowingly and voluntarily. Therefore, the district court properly granted summary judgment in favor of the Ford Motor Company, and we AFFIRM.