*Schuyler v. Sun Life Assurance Company of Canada*

# In the
# United States Court of Appeals
# For the Second Circuit

August Term, 2023

(Argued: June 24, 2024   Decided: August 14, 2025)

Docket No. 23-498

KRISTEN SCHUYLER,

*Plaintiff-Appellant*,

SUN LIFE ASSURANCE COMPANY OF CANADA,

*Defendant-Appellee*.

Before:     LIVINGSTON, *Chief Judge*, CHIN, and ROBINSON, *Circuit Judges*.

Plaintiff-Appellant Kristen Schuyler appeals from a judgment of the United States District Court for the Southern District of New York (Abrams, *J.*) in favor of Defendant-Appellee Sun Life Assurance Company of Canada ("Sun Life").   When Schuyler quit her job at Benco Dental Supply Company ("Benco"), she had a pending claim with Benco's long-term disability ("LTD") insurer and claims administrator, Sun Life.   Before Schuyler signed a separation agreement with Benco in which she agreed to release Benco and its "parents, subsidiaries, related or affiliated entities" and their agents from any and all claims, including those arising under the Employee Retirement Income Security Act of 1974 ("ERISA"), Benco representatives assured her that Sun Life was a separate and independent third party in

charge of the LTD program, and that the agreement would not affect her ability to appeal Sun Life's denial of her LTD claim. After Sun Life denied Schuyler benefits under the plan, Schuyler sued Sun Life under ERISA.

The district court granted Sun Life summary judgment, concluding that Schuyler released any claims against Sun Life through her Separation Agreement with Benco and that the release was knowing and voluntary. Schuyler now appeals.

We need not decide whether the release on its face waived Schuyler's claims against Sun Life because, based upon the totality of the circumstances, we hold that the undisputed facts reflect that any release of Schuyler's ERISA claims against Sun Life was not knowing and voluntary. Thus, we **VACATE** the judgment of the district court and **REMAND** to the district court for further proceedings consistent with this opinion.

Chief Judge Livingston dissents in a separate opinion.

---

GLENN R. KANTOR (Elizabeth Hopkins, Kantor & Kantor, LLP, Northridge, CA, Scott M. Riemer & Jennifer Hess, Riemer Hess LLC, New York, NY, *on the brief*) *for Plaintiff-Appellant*.

JOSHUA BACHRACH, Wilson, Elser, Moskowitz, Edelman & Dicker LLP, Philadelphia, PA *for Defendant-Appellee.*

---

ROBINSON, *Circuit Judge*:

Plaintiff Kristen Schuyler suffered a traumatic brain injury after she fell down a flight of stairs in 2015. When she left her job at Benco Dental Supply Company ("Benco") a few years later, she had a pending claim against Defendant-Appellee Sun Life Assurance Company of Canada ("Sun Life"), insurer and claims

2

administrator of the Benco Dental Supply Company Long Term Disability Plan ("LTD Plan"). Before Schuyler signed a Separation Agreement (the "Agreement") with Benco in which she agreed to release Benco and its "parents, subsidiaries, related or affiliated entities" and their agents from any and all claims, including those arising under the Employee Retirement Income Security Act of 1974 ("ERISA"), App'x 70, Benco representatives assured her that Sun Life was a separate and independent third party in charge of the LTD benefits, and that the agreement would not affect her ability to appeal Sun Life's denial of her LTD claim.

After Sun Life denied Schuyler benefits under the plan, Schuyler sued Sun Life under ERISA. Sun Life moved for summary judgment, arguing that the release in Schuyler's separation agreement with Benco precludes her claims against Sun Life. Schuyler cross-moved for summary judgment, arguing that the Agreement didn't bar her claims.

The United States District Court for the Southern District of New York (Abrams, *J.*) granted Sun Life's motion. It held that Sun Life was covered by the release and that Schuyler knowingly and voluntarily waived her ability to bring ERISA claims against it. Thus, it granted Sun Life summary judgment.

3

On appeal, Schuyler makes two arguments.   First, she contends that on this record, Sun Life did not and could not prove that she knowingly and voluntarily waived her right to bring ERISA claims against Sun Life.   Second, she argues that by its own terms the release does not extend to Sun Life, as it is not one of Benco's "parents, subsidiaries, . . . related or affiliated entities" or agents, and is not a "part[y]-in-interest," App'x 66, under the Agreement.   Sun Life disagrees with both assertions and urges us to affirm the district court's judgment.

We conclude on this record that any release of claims against Sun Life was not knowing and voluntary, and thus we need not consider whether the contractual release, by its terms, extends to Sun Life.   Accordingly, we **VACATE** the district court's entry of summary judgment for Sun Life and **REMAND** to the district court for further proceedings consistent with this opinion.

## BACKGROUND

The relevant facts below are largely undisputed unless otherwise noted.

### I.   Factual Background

In September 2015, Kristen Schuyler was visiting Nashville with friends when she fell down a flight of stairs.   She was admitted to the intensive care unit at Vanderbilt University Medical Center, where CT scans revealed fractures in her

4

skull, subdural hemorrhages, and cerebral contusion. Upon discharge, Schuyler was diagnosed with a traumatic brain injury.

At the time of her fall, Schuyler worked at Benco, a dental supply company. Since 2011, she had been a Territory Sales Representative at Benco, where she was responsible for a large portion of the Florida market and managed all of Benco's sales in a territory covering over 250 dentists. Her job required her to drive across the state to recruit clients, maintain business relationships, and host educational programming.

Schuyler continued working at Benco for several years. As time went on, she reported increasing difficulty managing her work due to symptoms she attributed to her brain injury.

She sought various forms of treatment, ranging from speech and physical therapy to hyperbaric oxygen treatment and other cognitive therapies. Nevertheless, Schuyler reported experiencing memory issues, mental and physical fatigue, as well as light and noise sensitivity that she said made it difficult for her to work.[1]

---

[1] Sun Life disputes Schuyler's assertion that she suffers from disabling symptoms. This dispute is not relevant to our analysis as to whether Schuyler knowingly and voluntarily waived her right to seek disability benefits from Sun Life.

On May 22, 2019, Schuyler began a six-month medical leave from Benco. Later that month, she submitted a claim for long-term disability benefits pursuant to the LTD Plan. This plan covered Benco employees. LTD benefits were insured through a policy issued by Sun Life, which was also the claims administrator for the LTD Plan.

In October 2019, Sun Life denied Schuyler's claim, concluding that the information she submitted was insufficient to establish that she was disabled under the policy.

Schuyler subsequently left her employment with Benco. In December 2019, Schuyler and Benco entered into a Separation Agreement and Release.

The preamble to the Agreement provides it was made and entered:

> by and between Kristen Schuyler . . . (hereinafter referred to as "Employee") and BENCO DENTAL COMPANY, for itself, its officers, directors, trustees, shareholders, partners, parents, subsidiaries, and any related or affiliated entities, employees, agents, attorneys, representatives, successors, assigns, and parties-in-interest (hereinafter referred to as "Benco").

App'x 66.

The Agreement included the following provision releasing Schuyler's claims, including her ERISA claims:

> Employee of her/his own free will, voluntarily releases and forever discharges Benco and any and all of its

6

parents, subsidiaries, related or affiliated entities . . . of and from any and all known and unknown actions, causes of action, suits, claims, debts, dues, accounts, bonds, covenants, charges, complaints, contracts, agreements, promises, judgments, and demands whatsoever, in law or equity, arising out of or in any way connected with Employee's employment with Benco, which Employee, her/his heirs, executors, administrators, successors and/or assigns may now have or hereafter can, shall, or may have for, upon or by reasons of any matter, cause or thing whatsoever, including, but not limited to, any and all matters arising out or in any way connected with Employee's employment with Benco and/or any related, affiliated, parent, and/or subsidiary of Benco, and Employee's separation from employment, including, but not limited to, any alleged violation of [a series of statutes, including ERISA], having any bearing whatsoever on the terms and conditions and/or cessation of any continued relationship with Benco, including any . . . type or manner of claim, which Employee had, now has, or shall have, known or unknown, as of the date of this Separation Agreement and Release.

App'x 70 ("the Release Provision").

In the run up to signing the Agreement, Schuyler reached out to Benco to negotiate and clarify the scope of the proposed contract. Schuyler asked Benco for clarification regarding the effect of the Release Provision on her claim for long-term disability benefits. Sun Life had denied her claim for LTD benefits in October, and Schuyler wanted to know whether the Agreement would affect her

7

ability to pursue the claim. Two sets of communications are relevant to Schuyler's inquiry.

In the first communication, dated October 29, 2019, Schuyler asked Benco whether, if she appealed Sun Life's denial, she would be eligible for employment with Benco again once approved for the benefits. In particular, she asked, "If I appeal the SunLife denial: []Will I be eligible for 'employment' again once approved for benefits? I've been told I would never be terminated while on LTD. This process can take up to nine months, perhaps years if we go to litigation." Supp. App'x 49.

In response, on November 7, 2019, Benco's attorney wrote: "[T]he decision as to whether to appeal the Sun Life Denial is yours and yours alone. Sun Life is a separate and independent third-party entity in charge of LTD." *Id.*

Later, in her second request for information from Benco, dated December 9, 2019, Schuyler asked Benco to "agree to cooperate with any and all requests regarding [her] SunLife Long Term Disability, SSDI [Social Security Disability Insurance], and other related claims in a timely manner" and to agree that the Agreement "will not affect [her] ability to appeal the SunLife LTD claim nor file SSDI." App'x 38.

Benco's counsel responded:

> Relative to the above (LTD, SSDI and other claims); Benco is solely a conduit and/or provider of documentary information. *Benco does not make any decisions relative to the SunLife Long Term Disability* and/or SSDI which is a governmental determination.
>
> That having been said, Benco does affirmatively agree to timely complete and submit any requests for information relative to the above captioned claims.(LTD/SSDI) I am sure your lawyer told you this as part of his/her advice to you, but *this agreement should have absolutely no effect on your ability to appeal your LTD* or to file for SSDI.

*Id.* (emphases added).

Benco told Schuyler she had until December 13, 2019, to decide whether to accept the offer. App'x 39. On December 12, Schuyler signed the Agreement. Under the Agreement, she was to receive severance payments from Benco totaling $25,000.

In January 2020, Schuyler lodged her appeal with Sun Life seeking review of its denial of benefits. After gathering additional evidence, Sun Life completed its appeal review and in August 2020, it again denied Schuyler's claim.

## II.    District Court Proceedings

In December 2020, Schuyler sued Sun Life in the United States District Court in the Southern District of New York. She alleged that Sun Life violated ERISA by wrongly refusing to pay her disability benefits to which she is entitled, failing

9

to provide a full and fair review of her claims, and failing to issue a timely decision on appeal.

In an amended answer to the complaint, Sun Life asserted that Schuyler's claims were waived on account of the Release Provision in the Agreement with Benco.

The parties cross-moved for summary judgment, and the district court ruled in Sun Life's favor. *See Schuyler v. Sun Life Assurance Company of Canada*, No. 20-cv-10905, 2023 WL 2388757 (S.D.N.Y. Mar. 7, 2023). Applying the six factors we articulated in *Laniok v. Advisory Comm. of Brainerd Mfg. Co. Pension Plan*, 935 F.2d 1360, 1368 (2d Cir. 1991), and *Bormann v. AT & T Communications, Inc.*, 875 F.2d 399, 403 (2d Cir. 1989), the district court concluded that Schuyler's release of her ERISA claims against Sun Life through her Agreement with Benco was knowing and voluntary. *See Schuyler*, 2023 WL 2388757, at *2–5. And the district court rejected Schuyler's argument that the Release Provision in the Agreement with Benco did not apply to her claims against Sun Life, concluding that Sun Life constitutes either "an 'affiliated' or 'related' entity" or a "party-in-interest" under the contract. *Id.* at *6. Consequently, the district court dismissed Schuyler's claims against Sun Life for denying her benefits under the LTD Plan. *Id.* Schuyler timely appealed.

10

## DISCUSSION

We review the grant of summary judgment without deference to the district court's analysis. *See Loomis v. ACE American Insurance Company*, 91 F.4th 565, 572 (2d Cir. 2024). Summary judgment is appropriate only if "there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). In reviewing the record on cross-motions for summary judgment, we "constru[e] the evidence in the light most favorable to the non-moving party and draw[] all reasonable inferences in its favor." *Nationwide Mut. Ins. Co. v. Mortensen*, 606 F.3d 22, 28 (2d Cir. 2010).[2,3]

Schuyler's appeal raises two questions: Did Schuyler knowingly and voluntarily release her ERISA claims *against Sun Life*? And in any event, does Schuyler's Separation Agreement with Benco by its terms bar her ERISA claims *against Sun Life*?

---

[2] In quotations from caselaw and the parties' briefing, this opinion omits all internal quotation marks, footnotes, and citations, and accepts all alterations, unless otherwise noted.

[3] Although both parties filed motions for summary judgment, only Sun Life's motion addressed the question whether Schuyler released her ERISA claims against Sun Life through the Agreement. Because we conclude as a matter of law that Schuyler didn't knowingly and voluntarily waive her ERISA claims against Sun Life, we review the evidence using the standard applicable to cross-motions for summary judgment. *Morales v. Quintel Entertainment, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001) (stating that when both parties move for summary judgment "each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration").

11

We need not answer the second question, because we conclude on this record that the undisputed evidence establishes as a matter of law that Schuyler did not knowingly and voluntarily release her ERISA claims against Sun Life. As set forth more fully below, an individual's purported relinquishment of rights under ERISA is subject to particularly close judicial scrutiny. The undisputed communications between the parties to the Agreement, supplemented by Schuyler's own testimony as to her understanding, establish Schuyler's understanding that the release did not extend to her ongoing claim against Sun Life. And none of the remaining evidence, individually or in combination, is sufficient to create a dispute of fact as to whether Schuyler knowingly released her claim against Sun Life.

## I. Releasing ERISA Claims

An individual can contractually waive an ERISA claim provided that the waiver is knowing and voluntary. *Laniok*, 935 F.2d at 1367. However, a waiver of an ERISA claim "is subject to closer scrutiny than a waiver of general contract claims." *Sharkey v. Ultramar Energy Ltd., Lasmo plc, Lasmo (AUL Ltd.)*, 70 F.3d 226, 231 (2d Cir. 1995). That's because individuals releasing ERISA claims "are relinquishing a right that ERISA indicates a strong congressional purpose of preserving." *Laniok*, 935 F.2d at 1367.

12

We explained in *Laniok* that a "totality of the circumstances inquiry" should guide the assessment of whether the relinquishment of a right to participate in an ERISA pension plan is knowing and voluntary. *Id.* We identified six factors that may be useful when evaluating whether the totality of the circumstances establish a knowing and voluntary waiver:

> 1) the plaintiff's education and business experience,
>
> 2) the amount of time the plaintiff had possession of or access to the agreement before signing it,
>
> 3) the role of [the] plaintiff in deciding the terms of the agreement,
>
> 4) the clarity of the agreement,
>
> 5) whether the plaintiff was represented by or consulted with an attorney, . . . and
>
> 6) whether the consideration given in exchange for the waiver exceeds employee benefits to which the employee was already entitled by contract or law.

*Id.* at 1367–68.

As we acknowledged in *Laniok*, none of these factors is necessarily dispositive and the list is not exhaustive. *Id.* at 1368. The "essential question" is "whether, in the totality of the circumstances, the individual's waiver of [the individual's] right can be characterized as knowing and voluntary." *Id.*

Because Sun Life contends that Schuyler released her ERISA claims against Sun Life through her Agreement with Benco, we must closely consider the totality of the circumstances in evaluating whether such purported waiver was knowing and voluntary.

## II. The Contracting Parties' Mutually Expressed Understanding

Turning to the circumstances of the waiver here, Schuyler argues that the central question is what she knew and intended in signing the release. She contends that, because she signed the agreement only *after* communicating to Benco's attorney that she intended to pursue her LTD claim against Sun Life, and only *after* confirming with Benco's attorney that the release would not impact her ability to do so, the evidence cannot support the conclusion that she knowingly waived her claims against Sun Life.

We agree. The undisputed evidence that the only counterparty to the Agreement expressly communicated to Schuyler that she would not be waiving her LTD claim by signing the Agreement, and that Schuyler understood that to be true, weighs heavily against the conclusion that Schuyler voluntarily waived her ERISA claims *against Sun Life*. And Sun Life's argument that Benco's assurance that Schuyler would not be waiving her claims against Sun Life applied only to her administrative appeal of its denial of her LTD claim is unpersuasive.

14

As noted above, the "essential question" is "whether, in the totality of the circumstances, the individual's waiver of [the individual's] right can be characterized as knowing and voluntary." *Id.*

The pre-execution communications between Schuyler and Benco—the actual parties to the Agreement—directly answer that question. When Schuyler asked questions about the effect on her appeal of Sun Life's denial, Benco's attorney responded, "Sun Life is a *separate* and *independent* third-party entity in charge of LTD." Supp. App'x 49 (emphasis added).

In response to Schuyler's proposal that Benco agree to cooperate with any and all requests regarding her disability claim and confirm that the Agreement would not affect her "ability to appeal the SunLife LTD claim," Benco's attorney responded, "Benco is solely a conduit and/or provider of documentary information. Benco does not make any decisions relative to SunLife Long Term Disability." App'x 38.

And, most significantly, Benco's lawyer concluded, "I am sure your lawyer told you this as part of his/her advice to you, but *this agreement should have absolutely no effect on your ability to appeal your LTD . . . .*" *Id.* (emphasis added). These undisputed communications establish that Benco, the only counterparty to the Agreement, expressly told Schuyler that the release would not waive her LTD

15

claim. Moreover, in repeatedly emphasizing Sun Life's independence from Benco, Benco effectively communicated to Schuyler that any release between her and Benco would not be binding on Sun Life or have any effect on Schuyler's LTD claim against Sun Life.[4]

Schuyler's affidavit confirms that she relied on the accuracy of Benco's representations when she signed the Agreement. She attested that she "only signed the [Agreement] because [Benco's] answers assured [her] the agreement would not limit [her] ability to receive long term disability benefits from Sun Life." Affidavit, *Schuyler v. Sun Life Assurance Company of Canada*, No. 1:20-cv-10905, Dkt. 47 ¶ 92. The district court concluded that Schuyler's "self-serving statements made after the fact cannot overcome" other relevant evidence. *Schuyler*, 2023 WL 2388757, at *6. But Schuyler's affidavit does not stand alone. The undisputed

---

[4] The dissent takes us to task for beginning our discussion with this fact rather than first walking through the specific factors enumerated in *Laniok*. *See* Dissent at 8. But our approach makes sense on this record. *Laniok* emphasized that the knowing and voluntary nature of a waiver in this context should be evaluated with reference to the "totality of the circumstances," and identified "a number of factors that [are] *useful*" in the totality assessment. 935 F.2d at 1367 (emphasis added). But it emphasized that the list "is obviously not exhaustive." *Id.* (citing *Bormann*, 875 F.2d at 403). And it made clear that "the very nature of the inquiry" forecloses "any attempt to establish a checklist of all applicable factors or to insist on rigid adherence to such a list." *Id.* at 1368. In this case, the fact that the employer who presented the release to Schuyler indicated to her not once, but twice, that the release would not affect her disability claim overwhelms the other considerations. The dissent shifts the focus from the ultimate question to some factors identified in *Laniok* as "useful" in the analysis, and treats the dispositive factor here—Benco's assurances—as an afterthought. But to start the totality assessment anywhere else would be incongruous.

16

communications between Schuyler and Benco *before* she signed the Agreement reinforce and corroborate her affidavit.

Sun Life and the dissent argue that Benco's assurances are immaterial because they related only to Schuyler's ability to appeal Sun Life's denial *through Sun Life's internal administrative process*, and did not convey that she would be able to pursue her LTD claim in court if she signed the Agreement. But this effort to parse Benco's assurances to suggest that Schuyler "misunderstood" them, Dissent at 3, runs headlong into the terms of the Agreement itself. The Agreement expressly releases "any and all known and unknown actions, causes of action, suits, *claims*, debts, dues, accounts, bonds, covenants, charges, complaints, *contracts*, *agreements*, *promises*, judgments, and demands whatsoever, in law or equity, arising out of or in any way connected with Employee's employment with Benco . . . . " App'x 70 (emphases added).

Whether pursued in court or administratively with the insurer, a claim for disability benefits is a "claim," and the right to those benefits arises from a "contract," "agreement" and "promise." Either the Agreement released Schuyler's LTD claim altogether, in which case Schuyler could neither appeal it administratively with Sun Life nor pursue it in court, or it didn't, in which case she could do both. The express terms of the release squarely undercut the

17

inference Sun Life urges—that the release allowed Schuyler to pursue her claims against Sun Life administratively, but not in court— and there is no basis in the record to infer that Benco's attorney's explicit and unqualified representation to Schuyler that the Agreement "*should have absolutely no effect on your ability to appeal your LTD*," *id.* at 38, applied only to her administrative appeal.

The undisputed evidence of Schuyler's reasonable understanding when she executed the Agreement, formed in reliance on the undisputed clear assurances from the counterparty's (Benco's) legal counsel, demonstrates as a matter of law that, regardless of the proper legal interpretation of the Agreement, she did not knowingly waive her LTD claim against Sun Life when she signed the Agreement.

### III. Countervailing Evidence and Arguments

We can imagine scenarios in which, notwithstanding Benco's clear assurances as to the effect of the Agreement between Benco and Schuyler, other evidence affecting the totality of the circumstances might create a genuine issue of fact as to whether Schuyler knowingly released her LTD claims against Sun Life. But we see no such evidence here. The Agreement did not so clearly waive Schuyler's LTD claim *against Sun Life* as to create a dispute as to the knowing character of any waiver, and none of the other *Laniok* factors create a genuine dispute.

*A.    The Agreement's Clarity*

Sun Life leans heavily on the asserted clarity of the Agreement, and suggests that Benco's assurances as to the scope of the Agreement cannot override the clear terms of the release.  Sun Life points to language in the Agreement releasing claims connected with Schuyler's employment with Benco, *expressly including ERISA claims*.  And it points to language affirming that Schuyler "fully read and [understood] the terms of [the] Agreement" and was "entering into [the] Agreement voluntarily."  App'x 71, 73.

Sun Life's argument might be persuasive if the question before us was whether Schuyler knowingly and voluntarily entered into the Agreement with Benco, or whether she knowingly and voluntarily waived her ERISA claims *against Benco*.  But the relevant question here is whether Schuyler knowingly and voluntarily waived her ERISA claim *as to Sun Life*.  The fact that the Agreement explicitly releases Schuyler's ERISA claims does not answer that question because Sun Life is neither a party to nor expressly mentioned anywhere in the Agreement.

We don't here decide as a matter of contract interpretation whether the Agreement on its face does or does not release Schuyler's claims against Sun Life, or whether it is ambiguous such that additional evidence or interpretive tools are required to determine its scope.  But we do conclude for purposes of the

knowing-and-voluntary analysis that the Agreement does not so clearly waive

Schuyler's claims against Sun Life as to override Benco's express assurances that

it does not.[5]

Because Sun Life is clearly distinct from and independent of Benco, the

counterargument rests primarily on the express applicability of the release to

Benco's "related or affiliated entities" and Benco's "agents."[6]  App'x 70.

According to Sun Life, it was so self-evidently a "related or affiliated" entity to

Benco that Schuyler could not have relied on Benco's express assurance that "Sun

[5] In the context of waivers of rights under the Age Discrimination in Employment Act (ADEA), this Court expressly rejected the proposition that "'ordinary contract principles' [apply] in determining whether a waiver has been signed 'knowingly and willfully.'" *Bormann*, 875 F.2d at 403. Instead, we adopted the "more stringent" "totality of the circumstances" standard for assessing whether a waiver of ADEA rights is knowing and voluntary. *Id.* In *Laniok*, we adopted a "similar totality of the circumstances inquiry" in the context of waivers of rights under ERISA. *Laniok*, 935 F.2d at 1367.

[6] This Court has recognized that an employer and its employer-sponsored ERISA plan are separate, distinct, and independent entities. *See Rothstein v. American International Group, Inc.*, 837 F.3d 195, 207 (2d Cir. 2016) (noting that many provisions in ERISA "are grounded on the concept that an employee benefit plan *must* be independent of the employer that sponsors the plan"). Accordingly, many courts have recognized that, in the absence of specific language incorporating ERISA plans, an employee's release of claims against the employer does not automatically waive claims against employer-sponsored benefit plans. *See, e.g., Groska v. Northern States Power Co. Pension Plan*, No. 05-cv-114, 2007 WL 2791119, at *8 (D. Minn. Sept. 24, 2007); *Antoniou v. Thiokol Corp. Group Long Term Disability Plan (Plan No. 503)*, 849 F. Supp. 1531, 1534 (M.D. Fla. 1994); *Hubbert v. Prudential Ins. Co. of America*, 105 F.3d 669, No. 96-1093, 1997 WL 8854, at *3 (10th Cir. 1997). Those courts that have held otherwise have often relied on the nature of the ERISA plan's funding, because "in an unfunded plan, "the entity from which the plaintiff really seeks recovery is the employer." *Bordonaro v. Union Carbide Corp.*, No. 01-cv-1177, 2002 WL 32824, at *3 (E.D. La. Jan. 11, 2002); *see also Linder v. BYK-Chemie USA, Inc.*, No. 3:02-cv-1956, 2006 WL 648206, at *11 (D. Conn. Mar. 10, 2006). Sun Life is an independent insurer; there is no evidence here that the LTD Plan is unfunded.

Life is a separate and independent third-party entity in charge of LTD," Supp. App'x 49, and that the Agreement "should have absolutely no effect" on her ability to appeal the denial of her LTD, App'x 38.

We don't view the Release Provision as sufficiently clear to create a dispute as to Schuyler's understanding in the face of Benco's express assurances. On the one hand, Black's Law Dictionary defines "affiliate" as "[a] corporation that is related to another corporation by shareholdings or other means of control; a subsidiary, parent, or sibling corporation." *Affiliate*, BLACK'S LAW DICTIONARY (12th ed. 2024). And the listing of "related or affiliated entities" alongside "parents" and "subsidiaries" arguably suggests that "related or affiliated entities" are entities connected by *corporate* affiliation, as opposed to contractual relationship. App'x 70; *see Northway Village No. 3, Inc. v. Northway Properties, Inc.*, 430 Pa. 499, 506 (1968) ("Words are known by the company they keep.").[7] *Accord Rothstein v. American International Group, Inc.*, 837 F.3d 195, 205 (2d Cir. 2016) (concluding that employee benefit plans under ERISA "cannot be considered affiliates under any ordinary or specialized understanding of that term").

---

[7] Because the Agreement provides that it "shall be . . . interpreted under the laws . . . of Pennsylvania," we consider general principles of Pennsylvania law in evaluating the clarity of the Agreement here. App'x 72.

Moreover, there is arguably insufficient evidence that Benco exercises control over Sun Life's administration of the LTD Plan to render Sun Life an "agent" of Benco. *See Radford Trust v. First Unum Life Ins. Co. of America*, 321 F. Supp. 2d 226, 242–43 (D. Mass. 2004), *rev'd in part on other grounds, appeal dismissed in part*, 491 F.3d 21 (1st Cir. 2007) (concluding that claims against an employer-sponsored disability plan's administrator were not barred by the release in an agreement between the employee and employer that extended to the employer's agents because the employer had "no power to control [the administrator's] actions in administering the Plan").

On the other hand, Black's Law Dictionary defines "related" as "[c]onnected in some way; having relationship to or with something else." *Related*, BLACK'S LAW DICTIONARY (12th ed. 2024). Using this definition, Sun Life is arguably a "related entity"—i.e., an entity "connected in some way" with Benco.

Moreover, some courts have held that employee benefit plans *are* "affiliates" and/or "related entities." *See, e.g., Liyan He v. Cigna Life Insurance Company of New York*, No. 14-cv-2180, 2017 WL 4350570, at * 2 (S.D.N.Y. July 7, 2017) (release of ERISA claims in employee's separation agreement reached all "affiliates," "related entities," and "agents" of the employer, including the independent insurance company that administered the employer's disability plan); *Goepfert v. Trustmark*

*Ins. Co.*, 541 F. Supp. 2d 1052, 1056 (E.D. Wis. 2008) (employee benefit plan was an "affiliate" of employer for purposes of the release).

We need not resolve the contractual interpretation questions here. They are thorny, and there is no consensus among courts that have considered similar releases. For purposes of our *Laniok* analysis, the question is not what the release in the Agreement *means*. The question is whether, notwithstanding Benco's express assurance to Schuyler that the Release Provision did not extend to Sun Life, the Release Provision by its plain terms so clearly extends to Sun Life as to create a genuine dispute as to whether Schuyler knowingly and voluntarily relinquished her LTD claim against Sun Life.[8]  We conclude that it does not.

---

[8]  For this reason, the dissent's reliance on the merger clause of the agreement is misplaced. Dissent at 17–18. True, an integration clause "is a clear sign that the writing is meant to" be a "contract complete within itself." *Yocca v. Pittsburgh Steelers Sports, Inc.*, 854 A.2d 425, 436 (2004). And generally in such circumstances, "All preliminary negotiations, conversations and verbal agreements are merged in and superseded by the subsequent written contract." *Id.* But whether Schuyler *contractually* waived her ERISA claims against Sun Life is a distinct inquiry from whether that waiver was knowing and voluntary. *Cf. Bormann*, 875 F.2d at 403 (adopting the "more stringent" totality of the circumstances test in assessing the "knowing and voluntary" question, instead of applying "ordinary contract principles"); *see also Finz*, 957 F.2d at 81 ("Because individuals waiving pension benefits claims are relinquishing rights that ERISA indicates a strong congressional purpose of preserving, we have required a close inspection of the totality of circumstances surrounding a waiver of ERISA benefits."). If the contract is unambiguous (a question we need not decide), then Benco's express assurances to Schuyler may not be relevant for purposes of interpreting the contract; but they *are* central to the question whether any waiver of Schuyler's LTD claim was knowing and voluntary.

23

### B.    *Other* Laniok *Factors*

Likewise, we conclude that none of the other relevant *Laniok* factors significantly move the needle in Sun Life's direction.    *See Laniok*, 935 F.2d at 1367–68.    Schuyler's education and business experience and the amount of time she had access to the Agreement before signing it, both viewed in the light most favorable to Sun Life, might be relevant considerations if the Release Provision so clearly extended to Sun Life that Schuyler could not reasonably rely on Benco's representations.    But for the reasons set forth above, in the face of Benco's assurances, there is no reason to conclude that a more thorough or sophisticated review of the Agreement would have undermined Schuyler's confidence that she was not releasing her LTD claim against Sun Life.    As noted above, these are questions that courts wrestle with.

Schuyler's role in negotiating the terms of the Agreement doesn't undermine our analysis.    She *did* participate in deciding the terms of the Agreement by getting Benco's assurance that the Agreement would not cut off her LTD claim.    If anything, this factor supports her argument.

The fact that Schuyler consulted with an attorney does not shift the analysis either.    Given the express assurances by *Benco's* lawyer and the lack of clarity of

the Agreement on the critical question, the fact that Schuyler consulted with counsel doesn't create a disputed issue.[9]

Finally, given the record here, the consideration paid *by Benco* for Schuyler's release— $25,000—is not so great as to create a dispute about whether the Agreement encompassed relinquishment of Schuyler's long-term disability claim—a claim that, if she prevailed, would presumably lead to substantial benefits if her disability continued. The fact that Benco, and only Benco, paid the agreed-upon severance payment to Schuyler reinforces the inference that Schuyler understood the Agreement to release only Schuyler's claims against Benco and not any claims against Sun Life.

The dissent argues that under *Laniok*, we look only at the "employee benefits to which the employee was already entitled by contract or law." Dissent at 15 (quoting *Laniok*, 935 F.2d at 1368). The dissent's suggestion that this factor weighs against Schuyler, however, makes no sense; from Schuyler's perspective, she *was* "already entitled" to long-term disability benefits and her claim was wrongfully denied. It isn't logical to conclude that Schuyler's right to long-term

---

[9] Ironically, Benco's lawyer wrote, "*I am sure your lawyer told you* . . . this agreement should have absolutely no effect on your ability to appeal your LTD . . . ." App'x 38 (emphasis added). Benco's lawyer's assumption undermines the suggestion that if Schuyler consulted with counsel, her lawyer must have told her that the Release Provision applied to her LTD claim.

disability benefits was worth little because Sun Life had denied her claim when Sun Life's denial was the very question in dispute. The record suggests that Schuyler's long-term disability benefits, if she had been awarded them, would have far exceeded the $25,000 Benco paid. According to Benco's plan, Schuyler would have been entitled to monthly benefits equal to 60% of her monthly earnings up to as much as $12,500 per month, potentially until she turned 65 years old. As she was apparently earning six figures, it is unlikely that Schuyler would have knowingly relinquished her potential rights to these benefits for only $25,000.

## CONCLUSION

The essential question here is whether, based on the totality of the circumstances, Schuyler's waiver of her ERISA claims as to Sun Life can be characterized as knowing and voluntary. The dissent contends that there is nothing in the record to support a finding for Schuyler. We conclude that there is nothing in the record to support a finding *for Sun Life*. Sun Life was not a party to the Agreement between Schuyler and Benco, and Sun Life was never mentioned by name in the Agreement. While the Agreement stated that it released all "related entities," Benco affirmatively told Schuyler on two separate occasions that Sun Life was an independent entity. Benco also assured Schuyler that the Agreement would have absolutely no impact on her ability to appeal her LTD

claim. The severance payment Schuyler negotiated was to be paid by Benco, and if Schuyler had been awarded long-term disability benefits from Sun Life, those benefits would have far exceeded the $25,000 that she received as severance. The suggestion that notwithstanding the above evidence, including Benco's assurances in response to her direct questions, a reasonable jury could conclude that Schuyler actually believed that she was waiving her claim for LTD benefits from Sun Life when she signed the agreement has no basis in this record.

We thus conclude that, as a matter of law, Schuyler didn't knowingly and voluntarily waive her right to pursue her LTD against Sun Life. Therefore, the district court erred in awarding summary judgment to Sun Life.

For the reasons discussed above, we **VACATE** the district court's entry of summary judgment for Sun Life and **REMAND** to the district court for further proceedings consistent with this opinion.

27

*Schuyler v. Sun Life Assurance Company of Canada*, No. 23-498

DEBRA ANN LIVINGSTON, *Chief Judge*, dissenting:

Plaintiff-Appellant Kristen Schuyler ("Schuyler") entered into a separation agreement (the "Agreement") when she left her job at Benco Dental Supply Company ("Benco"). Per its terms, the Agreement is effective between Schuyler, "her heirs, executors, administrators, successors, assigns, attorneys, and other representatives," and "BENCO DENTAL COMPANY, for itself, its officers, directors, trustees, shareholders, partners, parents, subsidiaries, and any related or affiliated entities . . . and parties-in-interest."[1] App'x 66.

In exchange for a lump sum payment and other consideration, Schuyler agreed to release Benco and its "related or affiliated entities" from claims "arising out of or in any way connected with [her] employment . . . including, but not limited to, any alleged violation of . . . ERISA." *Id.* at 70. Schuyler nonetheless brought an ERISA claim against Sun Life, Benco's long-term disability ("LTD") insurer, claim fiduciary, and claims administrator. The district court determined that the Agreement's release, to which Schuyler had knowingly and voluntarily

---

[1] As the district court noted, a "party-in-interest" is defined in the Employee Retirement Income Security Act of 1974 ("ERISA") as "any fiduciary (including, but not limited to, any administrator, officer, trustee or custodian) . . . of [an] employee benefit plan." 29 U.S.C. § 1002(14)(A); *see Schuyler v. Sun Life Assurance Co. of Can.*, No. 20-cv-10905, 2023 WL 2388757, at *6 (S.D.N.Y. Mar. 7, 2023). The parties agree that at all relevant times Defendant-Appellee Sun Life Assurance Company of Canada ("Sun Life") was a fiduciary of Benco's plan.

consented, bars Schuyler's ERISA claim. Accordingly, the court granted summary judgment in favor of Sun Life.

The majority concludes otherwise. It says the district court erred because Schuyler—an experienced businessperson, who was assisted by counsel and personally negotiated the terms of the Agreement—did not knowingly and voluntarily release her ERISA claims as to Sun Life. But rather than rely on the factors we ordinarily consider in cases like this, the majority bases its determination almost entirely on Schuyler's professed misunderstanding of an email exchange she had with Benco's counsel prior to signing the Agreement. In that exchange, Benco's lawyer stated that the Agreement "should have absolutely no effect on your ability to *appeal* your LTD." *Id.* at 38 (emphasis added). Schuyler claims that she understood this to mean not just that she would be able to pursue an administrative appeal at Sun Life (which she was considering, and which she ultimately pursued), but also that she would retain the ability to commence a separate federal lawsuit under ERISA, notwithstanding the release's express language to the contrary.

Here, it is the majority, not the district court, that reaches the wrong conclusion. Schuyler's self-serving and uncorroborated claim that she

2

misunderstood the scope of an agreement that she negotiated herself and reviewed with her counsel is not sufficient to overcome the balance of the factors we laid out in *Laniok v. Advisory Comm. of Brainerd Mfg. Co. Pension Plan*, 935 F.2d 1360 (2d Cir. 1991), each of which weighs in favor of finding Schuyler's ERISA waiver knowing and voluntary. Accordingly, I respectfully dissent.

## I. Background

Schuyler was diagnosed with traumatic brain injury in September 2015 after falling down a flight of stairs on a weekend trip with friends to Nashville, Tennessee. After undergoing an initial period of hospitalization, Schuyler returned to her job as a territory sales representative with Benco. Although she continued to seek medical treatment for her symptoms, Schuyler worked at Benco continuously over the next four years, with both her sales numbers and commission-based earnings increasing each year. Schuyler also earned additional income by working as a commercial and residential realtor on the side.

In May 2019, Schuyler filed for LTD benefits claiming that her condition had deteriorated to the point that she was totally disabled, as defined in Benco's group policy. Sun Life, based on its review, determined that the medical evidence did not support Schuyler's contention that her symptoms had worsened and that her

professional performance indicated that she was not totally disabled. On October 17, 2019, Sun Life denied Schuyler's LTD claim.

By this time, Schuyler was on a six-month leave of absence from Benco. On October 29, Schuyler wrote to inform the company that Sun Life had denied her LTD claim and that, while she "had some attractive offers from competitors," she was deciding between appealing the decision or arranging transitional work with Benco. Supp. App'x 48. Benco responded that "the decision as to whether to appeal the Sun Life Denial" was Schuyler's, but that it was unlikely to be able to hold her job open beyond November 24. *Id.* at 49–50.

Schuyler thereafter began to actively negotiate the Separation Agreement. She sought the inclusion of a mutual non-disparagement clause, the extension of her health insurance coverage, and an increase in the payout she would receive from entering into the Agreement. Benco agreed to continue her health care for several months, "added in some mutual non-disparagement language," and increased her payment from $19,584 to $25,000—changes, it observed, that Schuyler could "note in the updated agreement." App'x 35, 37.

Prior to signing the Agreement, Schuyler asserts that she had her disability attorney review it to make sure it "did not harm [her] LTD and [Social Security

4

Disability ("SSD")] Claims."[2]  *Id.* at 50.  In a December 3 email, Schuyler contacted Benco again, this time seeking, among other things, to confirm that "this Agreement will not affect [her] ability to appeal the SunLife LTD claim nor file [for SSD]."  *Id.* at 38.  Benco's attorney responded: "I am sure your lawyer told you this as part of his/her advice to you, but this agreement should have absolutely no effect on your ability to appeal your LTD or to file for [SSD]."  *Id.*

On December 12, 2019, Schuyler signed the Agreement—confirming that she had "fully read and underst[ood] the terms of [the] Agreement."  *Id.* at 71.  The Agreement contained the provisions that Schuyler had negotiated for and Benco agreed to include.  But it cautioned that Benco had "not made any representations or promises to her other than those specifically contained in the written provisions of this document."  *Id.*  In fact, the Agreement announced that it "supersede[d] any and all prior understandings and/or agreements between Employee and Benco, written or verbal, including, but not limited to, any written, oral, actual or implied employment agreement."  *Id.* at 72.

The Agreement also included a release provision that reached ERISA claims arising out of Schuyler's employment with Benco:

---

[2] The record does not disclose what advice Schuyler's attorney provided.

> Employee of her/his own free will, voluntarily releases and forever discharges Benco and any and all of its parents, subsidiaries, related or affiliated entities . . . of and from any and all known and unknown actions, causes of action, suits, claims, debts, dues, accounts, bonds, covenants, charges, complaints, contracts, agreements, promises, judgments, and demands whatsoever, in law or equity, arising out of or in any way connected with Employee's employment with Benco, which Employee, her/his heirs, executors, administrators, successors and/or assigns may now have or hereafter can, shall, or may have for, upon or by reasons of any matter, cause or thing whatsoever . . . including, but not limited to, any alleged violation of . . . the Employee Retirement Income Security Act of 1974 ("ERISA").

*Id.* at 70. The last provision in the Agreement reiterated that, by signing, Schuyler "understands that she is waiving any potential claim(s) she may have under . . . ERISA." *Id.* at 73.

In keeping with her stated intentions, Schuyler appealed Sun Life's denial of her LTD benefits in January 2020. Sun Life gathered additional medical and employment records, conducted a background investigation on Schuyler, referred her to a neurologist for further medical evaluation, and conferred with a vocational consultant. In August 2020, Sun Life denied Schuyler's appeal, concluding again that "the evidence does not support that Ms. Schuyler was unable to perform the Material and Substantial Duties of her Regular Occupation as of May 23, 2019 or thereafter." Supp. App'x 203. Sun Life noted that Schuyler's claims were

6

inconsistent with her increased productivity at work from 2015 through 2019 and also with evidence that she remained active in both her personal life and as a commercial and residential realtor during this period.

In December 2020, Schuyler sued Sun Life alleging violations of ERISA. After discovery, the parties cross-moved for summary judgment. The parties disputed (1) whether Schuyler had waived her right to file an ERISA suit against Sun Life, (2) whether Schuyler demonstrated by a preponderance of the evidence that she is entitled to LTD benefits under the plan, (3) whether Sun Life's denial of Schuyler's claim should be reviewed *de novo* or under a more deferential standard, and (4) whether Sun Life's denial of benefits was reasonable. The district court entered summary judgment for Sun Life, concluding (1) that the Agreement's release is effective as to Sun Life; and (2) that Schuyler knowingly and voluntarily waived her ability to bring an ERISA claim. *See Schuyler v. Sun Life Assurance Co. of Can.*, No. 20-cv-10905, 2023 WL 2388757 (S.D.N.Y. Mar. 7, 2023). The district court declined to reach the parties' other arguments. Schuyler timely appealed.

## II. *Laniok* **Factors**

An individual may contractually waive her right to pursue an ERISA claim. *Laniok*, 935 F.2d at 1366. But because "such individuals are relinquishing a right

7

that ERISA indicates a strong congressional purpose of preserving," that waiver must be "knowingly and voluntarily made." *Id.* at 1367. Although determining whether a waiver is knowing and voluntary depends on the totality of the circumstances, we have identified six non-exclusive factors to guide this inquiry:

1) the plaintiff's education and business experience,

2) the amount of time the plaintiff had possession of or access to the agreement before signing it,

3) the role of [the] plaintiff in deciding the terms of the agreement,

4) the clarity of the agreement,

5) whether the plaintiff was represented by or consulted with an attorney, [as well as whether an employer encouraged the employee to consult an attorney and whether the employee had a fair opportunity to do so] and

6) whether the consideration given in exchange for the waiver exceeds employee benefits to which the employee was already entitled by contract or law.

*Id.* at 1368 (quoting *Bormann v. AT & T Commc'ns, Inc.*, 875 F.2d 399, 403 (2d Cir. 1989)). Unlike the majority, I begin the knowing-and-voluntary analysis by considering these factors, each of which weighs in Sun Life's favor.

*First*, Schuyler is indisputably well-educated and has substantial practical business experience. She holds both bachelor's and master's degrees in business

8

administration. From 2011 to 2019, she served as a territory sales representative for Benco—a role in which she worked with contracts while overseeing "all Benco Dental Sales for a territory of over 250 dentists." Supp. App'x 20. Schuyler frequently used her Benco client network to connect doctors seeking to expand their practices by partnering with others in the field. In exchange, she negotiated flat fees or commission-based compensation for herself separate from her Benco income. Schuyler also has a real estate license and operated her own real estate business on the side until at least 2020. In sum, between her formal education and work experience, Schuyler was sophisticated enough to understand the effect of the waiver provision, particularly when assisted by her disability attorney. *See Finz v. Schlesinger*, 957 F.2d 78, 83 (2d Cir. 1992) (enforcing an ERISA waiver in part because there was not "a great disparity in the education or the bargaining power of the parties" and the plaintiff "knew exactly the bargain he was making"); *see also Bormann*, 875 F.2d at 403 (enforcing an age discrimination waiver as knowing and voluntary in part because the plaintiffs "were experienced executives familiar with reading and analyzing contracts").

*Second*, Schuyler had twenty days to consider the Agreement, which she twice affirmed was enough time to review its contents. *See* App'x 66 ("Employee

9

has been afforded a reasonable opportunity to consider this Agreement."); *id.* at 71 ("Employee . . . has been provided with adequate time to consider this Agreement, (in excess of 14 days) . . . ."). The Agreement also gave Schuyler an additional seven days after executing the Agreement to revoke it. The majority acknowledges that this timing should ordinarily cut in Sun Life's favor but deems the factor irrelevant because more time, in light of Schuyler's exchange with the Benco attorney, would not "have undermined Schuyler's confidence that she was not releasing her LTD claim against Sun Life." Maj. Op. at 24. The length of time Schuyler had to consider the Agreement, however, demonstrates that Benco did not prevent Schuyler from undertaking a full investigation of its legal ramifications in consultation with her attorney, a factor we have deemed significant. *See Frommert v. Conkright*, 535 F.3d 111, 122–23 (2d Cir. 2008), *rev'd on other grounds*, 559 U.S. 506 (2010).

*Third*, Schuyler admits to negotiating the terms of the Agreement herself. The majority interprets this as weighing in Schuyler's *favor* because she obtained "Benco's assurance that the Agreement would not cut off her LTD claim." Maj. Op. at 24. This misconstrues the operative question posed by the third *Laniok* factor. The role a plaintiff played during negotiations provides a window into the

10

degree of familiarity the plaintiff had with the terms of the agreement and also whether these terms were voluntarily accepted. Plaintiffs who played an active role in deciding an agreement's terms are more likely to know of its contents— including waivers—and to have voluntarily agreed to them. *See Bormann*, 875 F.2d at 403 n.1; *Sapio v. Selux Corp.*, 726 F. Supp. 3d 65, 86 (N.D.N.Y. 2024). Properly understood, this *Laniok* factor cuts in Sun Life's favor. Schuyler successfully negotiated for the inclusion of a mutual non-disparagement clause, the extension of her health insurance coverage, and an increase in consideration. These accomplishments indicate that Schuyler was intimately familiar with the Agreement's provisions. *See Frommert*, 535 F.3d at 122–23 (finding the fact that "[s]ome Plaintiffs-Appellees even modified the terms of the release forms with which they had been presented before signing them" indicative of a knowing and voluntary waiver).

*Fourth*, the release provision is clear. The majority does not dispute that the Agreement unambiguously waives Schuyler's right to bring ERISA claims against Benco as well as its "related or affiliated entities." App'x 70. Nor does the majority hold that the phrase "related or affiliated entities" excludes Sun Life. The majority instead concludes that the Agreement is not *sufficiently* clear as to whether Sun Life

qualifies as a "related or affiliated entity" for this factor to weigh against Schuyler in its determination whether she knowingly and voluntarily waived her ERISA claim. For the following reasons, I disagree.

"Unless otherwise specified, a contract's language shall be given its plain and ordinary meaning." *Wert v. Manorcare of Carlisle PA, LLC*, 124 A.3d 1248, 1259 (Pa. 2015). As the majority helpfully notes, "related" is defined as "[c]onnected in some way; having relationship to or with something else." *Related*, BLACK'S LAW DICTIONARY (12th ed. 2024). An "entity" is defined as "[a]n organization (such as a business or governmental unit) that has a legal identity apart from its members or owners." *Entity*, BLACK'S LAW DICTIONARY (12th ed. 2024). The plain meaning of a "related entity" in the context of this Agreement, then, is an organization with an independent legal identity that is in some way connected to or has a relationship with Benco. The contract requiring Sun Life to serve as Benco's insurer and claims administrator thus qualifies Sun Life as a "related entity" under the Agreement.[3] *See Liyan He v. Cigna Life Ins. Co. of N.Y.*, No. 14-cv-2180, 2017 WL 4350570, at *2 (S.D.N.Y. July 7, 2017) (identifying Cigna Life Insurance as a related

---

[3] The majority declines to decide whether Sun Life is actually released by the Agreement, concluding only that its terms were insufficiently clear to enable Schuyler's release to have been knowing and voluntary. For the reasons described here, I agree with the district court that Sun Life is a "related entity" and that the release therefore does reach Schuyler's ERISA claim.

12

entity of plaintiff's employer for purposes of determining the scope of a waiver in part because Cigna administered Cornell's disability benefits plan).

The majority's construction of the release provision is designed to generate ambiguity where none exists. The release, in relevant part, reaches "Benco and any and all of its parents, subsidiaries, [and] related or affiliated entities." App'x 70. On the one hand, the majority says, "affiliate" connotes a formal corporate relationship that Sun Life and Benco do not share, while on the other hand it acknowledges that "Sun Life is arguably a 'related entity.'"[4] Maj. Op. at 21–22. The majority's *only* explanation as to why Sun Life is not clearly a "related entity" is that the term appears alongside "parents" and "subsidiaries," both of which connote a formal corporate relationship. Maj. Op. at 21. But if, as the majority implies, a "related entity" must therefore also involve some form of corporate connection, then the term becomes surplusage. And Pennsylvania law—which governs the Agreement—embraces the "cardinal rule of contractual interpretation

---

[4] To be clear, I am not convinced that "affiliated entity" necessarily connotes a corporate relationship in this context. As the majority acknowledges, other courts have held that employee benefit plans are affiliates in certain circumstances. *See, e.g.*, *Liyan He*, 2017 WL 4350570, at * 2 (release of ERISA claims in employee's separation agreement reached all "affiliates," "related entities" and "agents" of the employer, which included Cigna, the insurance company that administered the employer's disability plan); *Goepfert v. Trustmark Ins. Co.*, 541 F. Supp. 2d 1052, 1056 (E.D. Wis. 2008) (employee benefit plan was an "affiliate" of employer for purposes of the release). I need not pursue the point here, however, since the release provision clearly reaches Sun Life, even assuming *arguendo* that the majority is correct.

13

that counsels against rendering words or provisions meaningless." *Pac. Emps. Ins. Co. v. Glob. Reinsurance Corp. of Am.*, 693 F.3d 417, 430 (3d Cir. 2012) (citing *Morris v. Am. Liab. & Sur. Co.*, 185 A. 201, 202 (Pa. 1936)).

The majority claims that there is "no consensus among courts that have considered similar releases." Maj. Op. at 23. Tellingly, however, it fails to identify a single case in which a court has held that "related entity" in the context of an ERISA waiver does not include the insurer and claims administrator. Given the plain meaning of "related entity," the release provision here can only reasonably be read the way the district court interpreted it: as a general release in a separation agreement designed to ask a departing employee to choose between a negotiated payment or the ability to pursue legal claims arising from her employment.[5]

The fifth and sixth *Laniok* factors similarly weigh in favor of the conclusion that Schuyler knowingly and voluntarily waived her ERISA claim. Schuyler acknowledges that she had a disability attorney review the agreement, specifically with reference to her claim with Sun Life. Moreover, Schuyler received $25,000 in consideration for entering into the Separation Agreement. The majority decides

---

[5] The majority supports its interpretation of the contract by noting that, in communications, Benco emphasized Sun Life's independence. Maj. Op. at 15, 20–21. But Benco made this claim only *in the context of explaining Benco's lack of authority over the LTD appeal. See* Supp. App'x 49; *see also* App'x 38 (emphasizing that "Benco does not make any decisions relative to the SunLife Long Term Disability").

that this is too modest an amount to support a finding that the release was knowing and voluntary given the value of her potential LTD claim. But *Laniok* suggests we look not at the plaintiff's valuation of a claim, but at "whether the consideration given in exchange for the waiver exceeds employee benefits *to which the employee was already entitled by contract or law*." 935 F.2d at 1368 (emphasis added) (quoting *Bormann*, 875 F.2d at 403). At the time Schuyler signed the Agreement, she was not "already entitled" to any LTD benefits. Her LTD claim had been denied by Sun Life and was pending an administrative appeal. On this record, I would not deem $25,000 so insignificant as to believe it impossible for Schuyler to have knowingly given up her right to bring an ERISA lawsuit should her administrative appeal fail.

### III.  Benco's "Assurances"

Every *Laniok* factor weighs in favor of finding Schuyler's ERISA waiver knowing and voluntary. The majority attempts to eschew this obvious conclusion by insisting that the *Laniok* factors are not a mere checklist to tick through. Instead, the majority rests its analysis on what it characterizes as the "totality of circumstances"—two email exchanges between Schuyler and Benco. But these exchanges do not provide "undisputed clear assurances" that the Agreement

15

would not limit Schuyler's ability to bring an ERISA suit against Sun Life in federal court. Maj. Op. at 18. I therefore agree with the district court that Schuyler's self-serving claim—that she signed the Agreement only "because [Benco Dental's] answers assured [her] the agreement would not limit [her] ability to receive long term disability benefits from Sun Life," App'x 51—"cannot overcome the *Laniok* factors that weigh decidedly in favor of finding a knowing and voluntary waiver." *Schuyler*, 2023 WL 2388757, at *6.

First, Benco did not make the assurance Schuyler claims it did. There is a stark distinction between administratively appealing the denial of benefits with an insurance provider and filing a federal lawsuit under ERISA. Benco's lawyer told Schuyler that the Agreement should not affect her ability to *appeal* Sun Life's denial of her LTD claim. Schuyler was focused on the possibility of an administrative appeal because Sun Life had denied her benefits claim just prior to this email exchange. Schuyler even acknowledges in her affidavit that she "framed [her] question regarding Sun Life as not changing [her] ability to appeal the denial." App'x 51. The majority's "totality of the circumstances"—and purported basis for writing off the *Laniok* factors—thus hinges on reading the word "appeal" in a way its author admits she did not intend. There is simply nothing in the record to

16

support Schuyler's assertion that she "understood [Benco's] response to mean that nothing about my disability benefits would be affected by the separation agreement."[6] *Id.*

Second, even if Benco *had* made the assurance the majority describes, it is nowhere to be found in the Agreement. Significantly, all the other points on which Schuyler obtained assurances from Benco during negotiations (the inclusion of a mutual non-disparagement clause, for instance) made it into the Agreement's language. Other, "prior understandings and/or agreements" were expressly "*supersede[d]*" by the Agreement. App'x 72 (emphasis added). The majority conveniently omits any mention of this language. Instead, it insists that Schuyler's release is not enforceable because "she relied on the accuracy of Benco's *representations* when she signed the Agreement." Maj. Op. at 16 (emphasis added). But Schuyler—who has extensive experience with contracts, who was aided by counsel, and who actively negotiated the Agreement herself—attested *in the Agreement* that she was not relying on "*any representations* or promises to her other

---

[6] The majority suggests that even if Benco and Schuyler were only discussing the appeal, Benco's representation to Schuyler is still inconsistent with the release provision, which purports to give up *any* claims arising from Schuyler's employment. This, the majority explains, would include Schuyler's administrative appeal. I might be more inclined to this argument—which Schuyler never raises herself— if Sun Life had, in fact, declined to consider Schuyler's administrative appeal. But Schuyler did appeal. And Sun Life did not rely on the Agreement in denying that appeal.

than those specifically contained in the . . . document." App'x 71 (emphasis added). Schuyler thus knew that she was not entitled to rely on Benco's representation, even if it had conveyed what the majority erroneously claims it did.

*　　*　　*

Congress passed ERISA "to promote the interests of employees and their beneficiaries in employee benefit plans and to protect contractually defined benefits." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 113 (1989) (internal quotation marks and citations omitted). We have thus held that ERISA waivers must be more closely scrutinized than ordinary waivers to give effect to this purpose and avoid problems of employer abuse. *Laniok*, 935 F.2d at 1367. But that scrutiny has limits. Schuyler should not be able to circumvent a waiver giving up all ERISA claims "arising out or in any way connected with [her] employment," App'x 70, by saying she did not know the release would extend to the party responsible for administering her employer's insurance plan. Every *Laniok* factor—as well as the totality of the circumstances, fairly considered—indicates Schuyler knew exactly the bargain she was making. I would therefore affirm the judgment in all respects.

18